# NATIONAL LABOR RELATIONS BOARD v. BELL AEROSPACE COMPANY, DIVISION OF TEXTRON, INC.

No. 72–1598. Argued January 14, 1974—Decided April 23, 1974

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BLACKMUN, and REHNQUIST, JJ., joined. WHITE, J., filed an opinion dissenting in part, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post,* p. 295.

*Norton J. Come* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Peter G. Nash, John S. Irving, Patrick Hardin,* and *Linda Sher.*

*Richard E. Moot* argued the cause and filed a brief for respondent.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents two questions: first, whether the National Labor Relations Board properly determined

---

*\*John Fillion, Stephen Schlossberg, Abe F. Levy, Victor Van Bourg, Charles K. Hackler,* and *Jack Levine* filed a brief for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America as *amicus curiae* urging reversal.

*Milton Smith, Gerard C. Smetana,* and *Jerry Kronenberg* filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

that all "managerial employees," except those whose participation in a labor organization would create a conflict of interest with their job responsibilities, are covered by the National Labor Relations Act;[1] and second, whether the Board must proceed by rulemaking rather than by adjudication in determining whether certain buyers are "managerial employees." We answer both questions in the negative.

## I

Respondent Bell Aerospace Co., Division of Textron, Inc. (company), operates a plant in Wheatfield, New York, where it is engaged in research and development in the design and fabrication of aerospace products. On July 30, 1970, Amalgamated Local No. 1286 of the United Automobile, Aerospace and Agricultural Implement Workers of America (union) petitioned the National Labor Relations Board (Board) for a representation election to determine whether the union would be certified as the bargaining representative of the 25 buyers in the purchasing and procurement department at the company's plant. The company opposed the petition on the ground that the buyers were "managerial employees" and thus were not covered by the Act.

The relevant facts adduced at the representation hearing are as follows. The purchasing and procurement department receives requisition orders from other departments at the plant and is responsible for purchasing all of the company's needs from outside suppliers. Some items are standardized and may be purchased "off the shelf" from various distributors and suppliers. Other items must be made to the company's specifications, and the requisition orders may be accompanied by detailed blueprints and other technical plans. Requisitions often designate a particular vendor, and in some instances the

---

[1] As amended, 61 Stat. 136, 73 Stat. 519, 29 U. S. C. § 151 *et seq.*

buyer must obtain approval before selecting a different one. Where no vendor is specified, the buyer is free to choose one.

Absent specific instructions to the contrary, buyers have full discretion, without any dollar limit, to select prospective vendors, draft invitations to bid, evaluate submitted bids, negotiate price and terms, and prepare purchase orders. Buyers execute all purchase orders up to $50,000. They may place or cancel orders of less than $5,000 on their own signature. On commitments in excess of $5,000, buyers must obtain the approval of a superior, with higher levels of approval required as the purchase cost increases. For the Minute Man missile project, which represents 70% of the company's sales, purchase decisions are made by a team of personnel from the engineering, quality assurance, finance, and manufacturing departments. The buyer serves as team chairman and signs the purchase order, but a representative from the pricing and negotiation department participates in working out the terms.

After the representation hearing, the Regional Director transferred the case to the Board. On May 20, 1971, the Board issued its decision holding that the company's buyers constituted an appropriate unit for purposes of collective bargaining and directing an election. 190 N. L. R. B. 431. Relying on its recent decision in *North Arkansas Electric Cooperative, Inc.*, 185 N. L. R. B. 550 (1970), the Board first stated that even though the company's buyers might be "managerial employees," [2] they

___

[2] The opinion revealed that Board Member Jenkins did not view the company's buyers as exercising managerial functions and therefore considered them "employees" under the Act to the same extent as production and maintenance employees. 190 N. L. R. B., at 431 n. 2. A majority of the Board, however, apparently accepted the company's contention that the buyers were managerial employees. *Id.*, at 432 n. 3.

were nevertheless covered by the Act and entitled to its protections., The Board then rejected the company's alternative contention that representation should be denied because the buyers' authority to commit the company's credit, select vendors, and negotiate purchase prices would create a potential conflict of interest between the buyers as union members and the company. In essence, the company argued that buyers would be more receptive to bids from union contractors and would also influence "make or buy" decisions in favor of "make," thus creating additional work for sister unions in the plant. The Board thought, however, that any possible conflict was "unsupported conjecture" since the buyers' "discretion and latitude for independent action must take place within the confines of the general directions which the Employer has established" and that "any possible temptation to allow sympathy for sister unions to influence such decisions could effectively be controlled by the Employer." 190 N. L. R. B., at 431.

On June 16, 1971, a representation election was conducted in which 15 of the buyers voted for the union and nine against. On August 12, the Board certified the union as the exclusive bargaining representative for the company's buyers. That same day, however, the Court of Appeals for the Eighth Circuit denied enforcement of another Board order in *NLRB* v. *North Arkansas Electric Cooperative, Inc.*, 446 F. 2d 602, and held that "managerial employees" were not covered by the Act and were therefore not entitled to its protections.[3] *Id.*, at 610.

Encouraged by the Eighth Circuit's decision, the company moved the Board for reconsideration of its earlier

---

[3] As mentioned, the Board had relied on its *North Arkansas* decision in the present case. The Eighth Circuit's earlier opinion concerning a related issue in the same case is reported at 412 F. 2d 324 (1969).

order. The Board denied the motion, 196 N. L. R. B. 827 (1972), stating that it disagreed with the Eighth Circuit and would adhere to its own decision in *North Arkansas*. In the Board's view, Congress intended to exclude from the Act only those "managerial employees" associated with the "formulation and implementation of labor relations policies." *Id.*, at 828. In each case, the "fundamental touchstone" was "whether the duties and responsibilities of any managerial employee or group of managerial employees do or do not include determinations which should be made free of any conflict of interest which could arise if the person involved was a participating member of a labor organization." *Ibid.* Turning to the present case, the Board reiterated its prior finding that the company had not shown that union organization of its buyers would create a conflict of interest in labor relations.

The company stood by its contention that the buyers, as "managerial employees," were not covered by the Act and refused to bargain with the union. An unfair labor practice complaint resulted in a Board finding that the company had violated §§ 8 (a)(5) and (1) of the Act, 29 U. S. C. §§ 158 (a)(5) and (1), and an order compelling the company to bargain with the union. 197 N. L. R. B. 209 (1972). Subsequently, the company petitioned the United States Court of Appeals for the Second Circuit for review of the order and the Board cross-petitioned for enforcement.

The Court of Appeals denied enforcement. 475 F. 2d 485 (1973). After reviewing the legislative history of the Taft-Hartley Act of 1947, 61 Stat. 136, and the Board's decisions in this area, the court concluded that Congress had intended to exclude all true "managerial employees" from the protection of the Act. It explained

that this "exclusion embraced not only an employee 'so closely related to or aligned with management as to place the employee in a position of conflict of interest between his employer on the one hand and his fellow workers on the other' but also one who is 'formulating, determining and effectuating his employer's policies or has discretion, independent of an employer's established policy, in the performance of his duties,' Illinois State Journal-Register, Inc. v. NLRB, 412 F. 2d 37, 41 (7 Cir. 1969)." 475 F. 2d, at 494. The court added, however, that "the Board would [not] be precluded, on proper proceedings, from determining that buyers, or some types of buyers, are not true 'managerial employees' and consequently come within the protection of § 8 (a)(5) and (1)." *Ibid.*

Turning to the merits of the present case, the court acknowledged that there was substantial evidence that the company's buyers were not sufficiently high in the managerial hierarchy to constitute true "managerial employees." Nevertheless, the court denied enforcement for two reasons. First, it was not certain that the Board's decision rested on a factual determination that these buyers were not true "managerial employees" rather than on "its new, and in our view, erroneous holding that it was free to regard *all* managerial employees as covered by the Act unless their duties met" the conflict-of-interest touchstone. *Id.*, at 494–495. Second, although the Board was not precluded from holding that buyers, or some types of buyers, were not "managerial employees," the court thought that, in view of the Board's long line of cases holding the contrary, it could not accomplish this change of position by adjudication. Rather, the Board should conduct a rulemaking proceeding in conformity with § 6 of the Act, 29 U. S. C. § 156. The court therefore remanded the case to the Board for such a proceeding.

We granted the. Board's petition for certiorari. 414 U. S. 816.

## II

We begin with the question whether all "managerial employees," rather than just those in positions susceptible to conflicts of interest in labor relations, are excluded from the protections of the Act.[4] The Board's early decisions, the legislative history of the Taft-Hartley Act of 1947, 61 Stat. 136, and subsequent Board and court decisions provide the necessary guidance for our inquiry. In examining these authorities, we draw on several established principles of statutory construction. In addition to the importance of legislative history, a court may

---

[4] Section 2 (3) of the Act defines the term "employee" as follows: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." 29 U. S. C. § 152 (3).

Supervisory employees are expresssly excluded from the protections of the Act. That term is defined in § 2 (11):

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment." 29 U. S. C. § 152 (11).

accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration.[5] This is especially so where Congress has re-enacted the statute without pertinent change.[6] In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.[7] We have also recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight.[8] Application of these principles leads us to conclude, as did the Court of Appeals, that Congress intended to exclude from the protections of the Act all employees properly classified as "managerial."

## A

The Wagner Act, 49 Stat. 449, did not expressly mention the term "managerial employee." After the Act's passage, however, the Board developed the concept of "managerial employee" in a series of cases involving the appropriateness of bargaining units. The first cases established that "managerial employees" were not to be included in a unit with rank-and-file employees. In

---

[5] *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969); *Zemel* v. *Rusk,* 381 U. S. 1, 11–12 (1965); *Udall* v. *Tallman,* 380 U. S. 1, 16–18 (1965); *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, 315 (1933).

[6] *Zemel* v. *Rusk, supra,* at 11–12; *Commissioner* v. *Noel Estate,* 380 U. S. 678, 682 (1965); *NLRB* v. *Gullett Gin Co.,* 340 U. S. 361, 365–366 (1951); *Helvering* v. *R. J. Reynolds Tobacco Co.,* 306 U. S. 110, 114–115 (1939); *Norwegian Nitrogen Co.* v. *United States, supra,* at 313.

[7] *Zemel* v. *Rusk, supra,* at 11–12; *Costanzo* v. *Tillinghast,* 287 U. S. 341, 345 (1932); *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472–473 (1915).

[8] *Red Lion Broadcasting Co.* v. *FCC, supra,* at 380–381; *FHA* v. *Darlington, Inc.,* 358 U. S. 84, 90 (1958).

*Freiz & Sons*, 47 N. L. R. B. 43, 47 (1943), for example, the Board excluded expediters from a proposed unit of production and maintenance workers because they were "closely related to the management." Similarly, in *Spicer Mfg. Corp.*, 55 N. L. R. B. 1491, 1498 (1944), expediters were again excluded from a unit containing office, technical, clerical, and professional employees because "the authority possessed by [the expediters] to exercise their discretion in making commitments on behalf of the Company stamps them as managerial." This rationale was soon applied to buyers. See, *e. g., Hudson Motor Car Co.*, 55 N. L. R. B. 509, 512 (1944); *Vulcan Corp.*, 58 N. L. R. B. 733, 736 (1944); *Barrett Division, Allied Chem. & Dye Corp.*, 65 N. L. R. B. 903, 905 (1946); *Electric Controller & Mfg. Co.*, 69 N L. R. B. 1242, 1245-1246 (1946). The Board summarized its policy on "managerial employees" in *Ford Motor Co.*, 66 N. L. R. B. 1317, 1322 (1946):

> "We have customarily excluded from bargaining units of rank and file workers executive employees who are in a position to formulate, determine and effectuate management policies. These employees we have considered and still deem to be 'managerial,' in that they express and make operative the decisions of management."

Whether the Board regarded all "managerial employees" as entirely outside the protection of the Act, as well as inappropriate for inclusion in a rank-and-file bargaining unit, is less certain. To be sure, at no time did the Board certify even a separate unit of "managerial employees" or state that such was possible. The Board was cautious, however, in determining which employees were "managerial." For example, in *Dravo Corp.*, 54 N. L. R. B. 1174, 1177 (1944), the Board excluded buyers and expediters from a unit of office and clerical em-

ployees, but reserved the question whether all such employees were to be considered "managerial":

"This is not to say, however, that buyers and expediters are to be denied the right to self-organization and to collective bargaining under the Act. The precise relationship of the buyers and expediters to management here is not now being determined by us."

During this period the Board's policy with respect to the related but narrower category of "supervisory employees" manifested a progressive uncertainty. The Board first excluded supervisors from units of rank-and-file employees, e. g., *Mueller Brass Co.*, 39 N. L. R. B. 167; 171 (1942), but in *Union Collieries Coal Co.*, 41 N. L. R. B. 961, supplemental decision, 44 N. L. R. B. 165 (1942), it certified a separate unit composed of supervisors who were to be represented by an independent union. Shortly thereafter, in *Godchaux Sugars, Inc.*, 44 N. L. R. B. 874 (1942), the Board approved a unit of supervisors whose union was affiliated with a union of rank-and-file employees. This trend was soon halted, however, by *Maryland Drydock Co.*, 49 N. L. R. B. 733 (1943), where the Board held that supervisors, although literally "employees" under the Act, could not be organized in any unit. And in *Yale & Towne Mfg. Co.*, 60 N. L. R. B. 626, 628–629 (1945), the Board further held that timestudy men, whose " 'interests and functions' " were " 'sufficiently akin to those of management,' " should neither be included in a unit with other employees, nor be established as a separate unit."

*Maryland Drydock, supra,* was subsequently overruled in *Packard Motor Car Co.*, 61 N. L. R. B. 4, 64 N. L. R. B. 1212 (1945), where the Board held that foremen could constitute an appropriate unit for collective bargaining. The Board's position was upheld 5–4 by this Court in

*Packard Co.* v. *NLRB*, 330 U. S. 485 (1947). In view of the subsequent legislative reversal of the *Packard* decision, the dissenting opinion of MR. JUSTICE DOUGLAS is especially pertinent. *Id.*, at 493. He stated:

"The present decision . . . tends to obliterate the line between management and labor. It lends the sanctions of federal law to unionization at all levels of the industrial hierarchy. It tends to emphasize that the basic opposing forces in industry are not management and labor but the operating group on the one hand and the stockholder and bondholder group on the other. The industrial problem as so defined comes down to a contest over a fair division of the gross receipts of industry between these two groups. The struggle for control or power between management and labor becomes secondary to a growing unity in their common demands on ownership.

"I do not believe this is an exaggerated statement of the basic policy questions which underlie the present decision. For if foremen are 'employees' within the meaning of the National Labor Relations Act, so are vice-presidents, managers, assistant managers, superintendents, assistant superintendents—indeed, all who are on the payroll of the company, including the president; all who are commonly referred to as the management, with the exception of the directors. If a union of vice-presidents applied for recognition as a collective bargaining agency, I do not see how we could deny it and yet allow the present application. But once vice-presidents, managers, superintendents, foremen all are unionized, management and labor will become more of a solid phalanx than separate factions in warring camps.

"[I]f Congress, when it enacted the National Labor

Relations Act, had in mind such a basic change in industrial philosophy, it would have left some clear and unmistakable trace of that purpose. But I find none." *Id.,* at 494–495.

Mr. Justice Douglas also noted that the Wagner Act was intended to protect "laborers" and "workers" whose right to organize and bargain collectively had not been recognized by industry, resulting in strikes, strife, and unrest. By contrast, there was no similar history with respect to foremen, managers, superintendents, or vice presidents. *Id.,* at 496–497. Furthermore, other legislation indicated that where Congress desired to include managerial or supervisory personnel in the category of employees, it did so expressly. See, *e. g.,* Railway Labor Act of 1926, 44 Stat. 577, 45 U. S. C. § 151; Merchant Marine Act, 1936, as amended, 52 Stat. 953, 46 U. S. C. § 1101 *et seq.;* Social Security Act, § 1101, 49 Stat. 647.

## B

The *Packard* decision was a major factor in bringing about the Taft-Hartley Act of 1947, 61 Stat. 136. The House bill, H. R. 3020, 80th Cong., 1st Sess. (1947),[9] provided for the exclusion of

---

[9] Section 2 (12) of the House bill defined the term "supervisor" as follows:

"The term 'supervisor' means any individual—

"(A) who has authority, in the interest of the employer—

"(i) to hire, transfer, suspend, lay off, recall, promote, demote, discharge, assign, reward, or discipline any individuals employed by the employer, or to adjust their grievances, or to effectively recommend any such action; or

"(ii) to determine, or make effective recommendations with respect to, the amount of wages earned by any individuals employed by the employer, or to apply, or to make effective recommendations with respect to the application of, the factors upon the basis of which the wages of any individuals employed by the employer are deter-

"supervisors," a. category broadly defined to include any individual who had authority to hire, transfer, prc - mote, discharge, reward, or discipline other employees or effectively to recommend such action. It also excluded (i) those who had authority to determine or effectively recommend the amount of wages earned by other em- ployees; (ii) those employed in labor relations, personnel, and employment departments, as well as police and time-study personnel; and (iii) confidential employees. The Senate version of the bill, S. 1126, 80th Cong., 1st Sess. (1947),[10] also excluded supervisors, but defined that category more narrowly than the House version, distinguishing between "straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management

---

mined, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the exercise of independent judgment;

"(B) who is employed in labor relations, personnel, employment, police, or time-study matters or in connection with claims matters of employees against employers, or who is employed to act in other respects for the employer in dealing with other individuals employed by the employer, or who is employed to secure and furnish to the employer information to be used by the employer in connection with any of the foregoing; or

"(C) who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for use in the interest of the employer."

[10] Section 2 (11) of the Senate bill contained the following definition of the term "supervisor":

"The term 'supervisor' means any individual having authority, in the interest of the employer to hire, transfer, suspend, lay off, recall, promcte, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action." S. Rep. No. 105, 80th Cong., 1st Sess., 4 (1947). It was the Senate's view that employees such as "straw bosses," who had only minor supervisory duties, should be included within the Act's protections.

Significantly, both the House Report and the Senate Report voiced concern over the Board's broad reading of the term "employee" to include those clearly within the managerial hierarchy. Focusing on MR. JUSTICE DOUGLAS' dissent in *Packard,* the Senate Report specifically mentioned that even vice presidents might be unionized under the Board's decision. *Ibid.* It also noted that unionization of supervisors had hurt productivity, increased the accident rate, upset the balance of power in collective bargaining, and tended to blur the line between management and labor. *Id.,* at 4–5. The House Report echoed the concern for reduction of industrial output and noted that unionization of supervisors had deprived employers of the loyal representations to which they were entitled.[11] And in criticizing the

---

[11] The Report also makes evident that Congress was concerned with more than just the possibility of a conflict of interest in labor relations if supervisors were unionized:

"Supervisors are management people. They have distinguished themselves in their work. They have demonstrated their ability to take care of themselves without depending upon the pressure of collective action. No one forced them to become supervisors. They abandoned the 'collective security' of the rank and file voluntarily, because they believed the opportunities thus opened to them to be more valuable to them than such 'security.' It seems wrong, and it is wrong, to subject people of this kind, who have demonstrated their initiative, their ambition and their ability to get ahead, to the leveling processes of seniority, uniformity and standardization that the Supreme Court recognizes as being fundamental principles of unionism. (*J. I. Case Co.* v. *National Labor Relations Board,* 321 U. S. 332 (1944).) It is wrong for the foremen, for it discourages

Board's expansive reading of the Act's definition of the term "employees," the House Report noted that "[w]hen Congress passed the Labor Act, we were concerned, as we said in its preamble, with the welfare of 'workers' and 'wage earners,' not of the boss." H. R. Rep. No. 245, 80th Cong., 1st Sess., 13 (1947).

The Conference Committee adopted the Senate version of the bill. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947). The House Managers' statement in explanation of the Conference Committee Report stated:

> "The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel, the special provisions of the Senate amendment . . . applicable with respect to professional employees will cover many of this category. In the case of guards, the conference agreement does not permit the

the things in them that made them foremen in the first place. For the same reason, that it discourages those best qualified to get ahead, it is wrong for industry, and particularly for the future strength and productivity of our country." H. R. Rep. No. 245, 80th Cong., 1st Sess., 16–17 (1947).

certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards." *Id.*, at 35–36.

The legislative history of the Taft-Hartley Act of 1947 may be summarized as follows. The House wanted to include certain persons within the definition of "supervisors," such as straw bosses, whom the Senate believed should be protected by the Act. As to these persons, the Senate's view prevailed. There were other persons, however, who both the House and the Senate believed were plainly outside the Act. The House wanted to make the exclusion of certain of these persons explicit. In the conference agreement, representatives from both the House and the Senate agreed that a specific provision was unnecessary since the Board had long regarded such persons as outside the Act. Among those mentioned as impliedly excluded were persons working in "labor relations, personnel and employment departments," and "confidential employees." But assuredly this did not exhaust the universe of such excluded persons. The legislative history strongly suggests that there also were other employees, much higher in the managerial structure, who were likewise regarded as so clearly outside the Act that no specific exclusionary provision was thought necessary. For example, in its discussion of confidential employees, the House Report noted that "[m]ost of the people who would qualify as 'confidential' employees are *executives and are excluded from the act in any event.*" H. R. Rep. No. 245, p. 23 (emphasis added).[12] We think

---

[12] The Report stated in reference to "confidential employees":

"These are people who receive from their employers information that not only is confidential but also that is not available to the public, or to competitors, or to employees generally. *Most of the*

the inference is plain that "managerial employees" were paramount among this impliedly excluded group. The Court of Appeals in the instant case put the issue well:

> "Congress recognized there were other persons so much more clearly 'managerial' that it was inconceivable that the Board would treat them as employees. Surely Congress could not have supposed that, while 'confidential secretaries' could not be organized, their bosses could be. In other words, Congress failed to enact the portion of MR. JUSTICE DOUGLAS' *Packard* dissent relating to the organization of executives, not because it disagreed but because it deemed this unnecessary." 475 F. 2d, at 491–492.[13]   (Footnote omitted.)

---

*people who would qualify as 'confidential' employees are executives and are excluded from the act in any event.*

"The Board, itself, normally excludes from bargaining units confidential clerks and secretaries to such people as these." *Ibid.* (Emphasis added.)

In 1946 in *Ford Motor Co.*, 66 N. L. R. B. 1317, 1322, the Board had narrowed its definition of "confidential employees" to embrace only those who exercised " 'managerial' functions in the field of labor relations." The discussion of "confidential employees" in both the House and Conference Committee Reports, however, unmistakably refers to that term as deʿ ·d in the House bill, which was not limited just to those in "labor relations." Thus, although Congress may have misconstrued recent Board practice, it clearly thought that the Act did not cover "confidential employees" even under a broad definition of that term.

[13] The dissenting opinion first asserts that the Act is "very plain on its face" and covers all employees except those expressly excluded *post*, at 297, but later concedes that the "Conference Committee implied that certain groups of employees were to be excluded." *Post*, at 305. The dissent then argues that "managerial employees" were not among those impliedly excluded because "no such explicit direction was set forth." *Ibid.* This overlooks the fact that, as in the case of "confidential employees" and those working in "labor relations, personnel and employment departments," no explicit ex-

## C

Following the passage of the Taft-Hartley Act, the Board itself adhered to the view that "managerial employees" were outside the Act. In *Denver Dry Goods,* 74 N. L. R. B. 1167, 1175 (1947), assistant buyers, who

clusionary provision was necessary in 1947 because the Board had never approved the organization of "managerial employees" in either a separate unit or as part of a rank-and-file unit. Indeed, every prior Board decision had resulted in the exclusion of such employees as "managerial."

Moreover, it cannot be denied that Congress thought that "executives" were excluded from the Act, for the House Report so stated in express terms. See n. 12, *supra.* And the congressional debates, along with the Senate Report, evinced a concern over the possible extension of the Act to cover corporate vice presidents and other executives who were part of management. See, *e. g.,* 93 Cong. Rec. 3443, 4136, 5014.

In addition, the dissent completely ignores the fundamental change in industrial philosophy which would be accomplished through unionization of "managerial employees." As MR. JUSTICE DOUGLAS explained in his *Packard* dissent, the Wagner Act was designed to protect "laborers" and "workers," not vice presidents and others clearly within the managerial hierarchy. Extension of the Act to cover true "managerial employees" would indeed be revolutionary, for it would eviscerate the traditional distinction between labor and management. If Congress intended a result so drastic, it is not unreasonable to expect that it would have said so expressly.

The dissent also relies upon the specific inclusion of "professional employees" within the Act to support its assertion that "managerial employees" were to be similarly treated. *Post,* at 297–298. See 29 U. S. C. § 152 (12). "Professional employees," however, are plainly not the same as "managerial employees." As the Conference Committee Report explained, the term "professional employees" refers to "such persons as legal, engineering, scientific and medical personnel together with their junior professional assistants." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 36. In contrast to "managerial employees," they are not defined in terms of their authority "to formulate, determine and effectuate management policies." *Ford Motor Co.,* 66 N. L. R. B., at 1322.

were required to set good sales records as examples to sales employees, to assist buyers in the selection of merchandise, and to assume the buyer's duties when the latter was not present, were excluded by the Board on the ground that "the interests of these employees are more closely identified with those of management." The Board reiterated this reading of the Act in *Palace Laundry Dry Cleaning*, 75 N. L. R. B. 320, 323 n. 4 (1947):

> "The determination of 'managerial,' like the determination of 'supervisory,' is to some extent necessarily a matter of the degree of authority exercised. We have in the past, and before the passage of the recent amendments to the Act, recognized and defined as 'managerial' employees, executives who formulate and effectuate management policies by expressing and making operative decisions of their employer, and have excluded such managerial employees from bargaining units. We believe that the Act, as amended, contemplates the continuance of this practice." (Citations omitted.)

Buyers and assistant buyers were again excluded in *Denton's, Inc.*, 83 N. L. R. B. 35, 37 (1949), because their "interests . . . are more closely identified with management . . . ." And in *American Locomotive Co.*, 92 N. L. R. B. 115, 116–117 (1950), the Board held that buyers could neither be included in a unit of office and clerical employees nor placed in a separate unit, stating:

> "The Employer maintains that the buyers are representatives of management. As it appears that the buyers are authorized to make substantial purchases for the Employer, we find that they are representatives of management, and as such may not be accorded bargaining rights under the Act."

Buyers, who were authorized to bind the employer without prior approval, were also excluded from a unit in

*Curtiss-Wright Corp.*, 103 N. L. R. B. 458, 464 (1953), because "they are representatives of management and as such may not be accorded bargaining rights under the Act."

Finally, in *Swift & Co.*, 115 N. L. R. B. 752, 753–754 (1956), the Board reaffirmed its long-held understanding of the scope of the Act. In refusing to approve a unit of procurement drivers who were found to be representative of management, the Board declared:

> "It was the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management. Such individuals cannot be deemed to be employees for the purposes of the Act. Accordingly, we reaffirm the Board's position that representatives of management may not be accorded bargaining rights under the Act . . . ." (Footnotes omitted.)

Until its decision in *North Arkansas* in 1970, the Board consistently followed this reading of the Act.[14] It never

---

[14] See, *e. g., Eastern Camera & Photo Corp.*, 140 N. L. R. B. 569, 571 (1963); *AFL–CIO*, 120 N. L. R. B. 969, 973 (1958); *General Tel. Co. of Ohio*, 112 N. L. R. B. 1225, 1229 (1955).

The cases excluding buyers or those exercising buyers' functions from other units are legion. See, *e. g., Ed's Foodland of Springfield, Inc.*, 159 N. L. R. B. 1256, 1260 (1966); *Albuquerque Div., ACF Ind., Inc.*, 145 N. L. R. B. 403, 414–415 (1963); *Weaver Motors*, 123 N. L. R. B. 209, 215–216 (1959); *Kearney & Trecker Corp.*, 121 N. L. R. B. 817, 822 (1958); *Temco Aircraft Corp.*, 121 N. L. R. B. 1085, 1089 (1958); *Federal Tel. & Radio Co.*, 120 N. L. R. B. 1652, 1653–1654 (1958).

Surprisingly, the dissent maintains that the Board "actually held only twice" that "managerial employees" were not covered by the Act. *Post*, at 309. This is difficult to reconcile with the undisputed fact that until its decision in *North Arkansas* the Board had never even certified a separate unit of "managerial employees" and had stated in case after case that managerial employees were not to be accorded bargaining rights under the Act. *E. g., Palace Laundry*

certified any unit of "managerial employees," separate or otherwise, and repeatedly stated that it was Congress' intent that such employees not be accorded bargaining rights under the Act. And it was this reading which was permitted to stand when Congress again amended the Act in 1959. 73 Stat. 519.

The Board's exclusion of "managerial employees" defined as those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer," [15] has also been approved by courts without exception. See, e. g., *Westinghouse Electric Corp.* v. *NLRB*, 424 F. 2d 1151, 1158 (CA7), cert. denied, 400 U. S. 831 (1970); *Illinois State Journal-Register, Inc.* v. *NLRB*, 412 F. 2d 37, 41 (CA7 1969); *Continental Insurance Co.* v. *NLRB*, 409 F. 2d 727, 730 (CA2), cert. denied, 396 U. S. 902 (1969); *Retail Clerks International Assn.* v. *NLRB*, 125 U. S. App. D. C. 63, 65–66, 366 F. 2d 642, 644–645 (1966) (Burger, J.), cert. denied, 386 U. S. 1017 (1967); [16] *International Ladies'*

_____

*Dry Cleaning,* 75 N. L. R. B. 320 (1947); *American Locomotive Co.,* 92 N. L. R. B. 15 (1950); *Curtiss-Wright Corp.,* 103 N. L. R. B. 458 (1953); *Swift & Co.,* 115 N. L. R. B. 752 (1956), and cases cited above.

[15] *Palace Laundry Dry Cleaning,* supra, at 323 n. 4. See *Ford Motor Co.,* 66 N. L. R. B., at 1322.

[16] In *Retail Clerks International Assn.* v. *NLRB, supra,* MR. CHIEF JUSTICE (then Circuit Judge) BURGER explained the Board's policy on "managerial employees":

"The Board also excludes from the protections of the Act, as *managerial employees,* 'those who formulate, determine, and effectuate an employer's policies,' *AFL–CIO,* [120 N. L. R. B. 969, 973 (1958)], and those who have discretion in the performance of their jobs; but not if the discretion must conform to an employer's established policy, *Eastern Camera and Photo Corp.,* 140 N. L. R. B. 569, 571 (1963) (store managers who could set prices are not managerial). The rationale for this Board policy, though unarticulated, seems to be the reasonable belief that Congress intended to ex-

*Garment Workers' Union* v. *NLRB*, 339 F. 2d 116, 123 (CA2 1964) (Marshall, J.).[17]  And in *NLRB* v. *North Arkansas Electric Cooperative, Inc.,* 446 F. 2d 602 (1971), the Eighth Circuit reviewed the history of the Act and specifically disapproved the Board's departure from its earlier position.

## D

In sum, the Board's early decisions, the purpose and legislative history of the Taft-Hartley Act of 1947, the Board's subsequent and consistent construction of the Act for more than two decades, and the decisions of the courts of appeals all point unmistakably to the conclusion that "managerial employees" are not covered by the Act.[18]  We agree with the Court of Appeals below that the Board "is not now free" to read a new and more restrictive meaning into the Act.  475 F. 2d, at 494.

In view of our conclusion, the case must be remanded to permit the Board to apply the proper legal standard

---

clude from the protection of the Act those who comprised a part of 'management' or were allied with it on the theory that they were the one[s] from whom the workers needed protection."  366 F. 2d, at 645.  (Emphasis added.)

[17] In *International Ladies' Garment Workers' Union* v. *NLRB, supra,* Mr. Justice (then Circuit Judge) Marshall explained that "[a]lthough the Act makes no special provision for 'managerial employees,' under a Board policy of long duration, this category of personnel has been excluded from the protection of the Act." 339 F. 2d, at 123.

[18] The contrary interpretation of the Act urged by the dissent would have far-reaching results.  Although a shop foreman would be excluded from the Act, a wide range of executives would be included.  A major company, for example, may have scores of executive officers who formulate and effectuate management policies, yet have no supervisory responsibility or identifiable conflict of interest in labor relations.  If Congress intended the unionization of such executives, it most certainly would have made its design plain.  See n. 13, *supra.*

in determining the status of these buyers.[19] *SEC* v.
*Chenery Corp.*, 318 U. S. 80, 85 (1943); *FTC* v. *Sperry &
Hutchinson Co.*, 405 U. S. 233, 249 (1972). We express no
opinion as to whether these buyers fall within the category of "managerial employees." [20]

### III

The Court of Appeals also held that, although the
Board was not precluded from determining that buyers
or some types of buyers were not "managerial employees,"
it could do so only by invoking its rulemaking procedures
under § 6 of the Act, 29 U. S. C. § 156.[21] We disagree.

---

[19] The Board has had ample experience in defining the term
"managerial" in the manner which we think the Act contemplates.
See, *e. g., Eastern Camera & Photo Corp., supra*, at 571. Of course,
the specific job title of the employees involved is not in itself controlling. Rather, the question whether particular employees are
"managerial" must be answered in terms of the employees' actual
job responsibilities, authority, and relationship to management.

[20] To be sure, it would also be appropriate for the Board to exclude
employees from a unit on the ground that their participation in a
labor organization would create a conflict of interest with their job
responsibilities. *New England Telephone*, 90 N. L. R. B. 639 (1950).
See also *Retail Clerks International Assn.* v. *NLRB*, 125 U. S. App.
D. C., at 65–66, 366 F. 2d, at 644–645. In this respect, respondent
has suggested that it was never afforded fair notice and an opportunity to introduce evidence relating specifically to the possibility of
a conflict of interest in labor relations. Tr. of Oral Arg. 33–35,
43, 47. At the representation hearing, the hearing officer did not
indicate that the conflict-of-interest standard was relevant, and
respondent proceeded on the assumption that the only question was
whether the buyers were "managerial employees." App. 8, 83.
The present record may well be adequate for purposes of this
determination. However, if new and relevant information on this
point is tendered on remand, the Board should consider reopening
the record for purposes of its admission.

[21] Section 6 provides:
"The Board shall have authority from time to time to make, amend,
and rescind, in the manner prescribed by the Administrative Pro-

At the outset, the precise nature of the present issue must be noted. The question is not whether the Board should have resorted to rulemaking, or in fact improperly promulgated a "rule," when in the context of the prior representation proceeding it held that the Act covers all "managerial employees" except those meeting the new "conflict of interest in labor relations" touchstone. Our conclusion that the Board applied the wrong legal standard makes consideration of that issue unnecessary. Rather, the present question is whether on remand the Board must invoke its rulemaking procedures if it deter-

---

cedure Act, such rules and regulations as may be necessary to carry out the provisions of this subchapter." 29 U. S. C. § 156.

The Administrative Procedure Act (APA) defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . ." 5 U. S. C. § 551 (4). The rulemaking requirements include publication in the Federal Register of notice of the proposed rulemaking and hearing; an opportunity for interested persons to participate; a statement of the basis and purpose of the proposed rule; and publication in the Federal Register of the rule as adopted.

The APA defines "adjudication" as "agency process for the formulation of an order," and "order" is defined as "the whole or a part of a final disposition whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U. S. C. §§ 551 (7), (6). Proceedings for "the certification of worker representatives" are exempted from the Act's procedural requirements for an "adjudication." 5 U. S. C. §§ 554 (a) (6), 556 (a), 557 (a).

Sections 9 (c) (1) and (2) of the National Labor Relations Act (NLRA) empower the Board to investigate petitions involving questions of unit representation, to conduct hearings on such petitions, to direct representation elections, and to certify the results thereof. 29 U. S. C. §§ 159 (c) (1) and (2). Board determinations on such representation questions would appear to constitute "orders" within the meaning of the APA. See 5 U. S. C. §§ 551 (6), (7).

The NLRA does not specify in what instances the Board must resort to rulemaking.

mines, in light of our opinion, that these buyers are not "managerial employees" under the Act. The Court of Appeals thought that rulemaking was required because *any* Board finding that the company's buyers are not "managerial" would be contrary to its prior decisions[22] and would presumably be in the nature of a general rule designed "to fit all cases at all times."

A similar issue was presented to this Court in its second decision in *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947) (*Chenery II*).[23] There, the respondent corporation argued that in an adjudicative proceeding the Commission could not apply a general standard that it had formulated for the first time in that proceeding. Rather, the Commission was required to resort instead to its rulemaking procedures if it desired to promulgate a new standard that would govern future conduct. In rejecting this contention, the Court first noted that the Commission had a statutory duty to decide the issue at hand in light of the proper standards and that this duty remained "regardless of whether those standards previously had been spelled out in a general rule or regulation." *Id.*, at 201. The Court continued:

> "The function of filling in the interstices of the [Securities] Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which

---

[22] A number of Board decisions have excluded buyers from units of rank-and-file employees. See n. 14, *supra*. But *American Locomotive Co.* and *Swift & Co.* appear to be the only cases in which the Board has held that buyers are not entitled to organize in a separate unit.

[23] *Chenery II* did not involve § 4 of the APA, 5 U. S. C. § 553, but is nevertheless analogous.

arise. . . . Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. *In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.*

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. *Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.* In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards." *Id.,* at 202–203. (Emphasis added.)

The Court concluded that "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.,* at 203.

And in *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759 (1969), the Court upheld a Board order enforcing an election list requirement first promulgated in an earlier adjudicative proceeding in *Excelsior Underwear Inc.,* 156 N. L. R. B. 1236 (1966). The plurality opinion of Mr.

Justice Fortas, joined by The Chief Justice, MR. JUSTICE STEWART, and MR. JUSTICE WHITE, recognized that "[a]d-judicated cases may and do . . . serve as vehicles for the formulation of agency policies, which are applied and announced therein," and that such cases "generally provide a guide to action that the agency may be expected to take in future cases." *NLRB* v. *Wyman-Gordon Co.,* *supra,* at 765–766. The concurring opinion of Mr. Justice Black, joined by MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL, also noted that the Board had both adjudicative and rulemaking powers and that the choice between the two was "within its informed discretion." *Id.,* at 772.

The views expressed in *Chenery II* and *Wyman-Gordon* make plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion. Although there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act, nothing in the present case would justify such a conclusion. Indeed, there is ample indication that adjudication is especially appropriate in the instant context. As the Court of Appeals noted, "[t]here must be tens of thousands of manufacturing, wholesale and retail units which employ buyers, and hundreds of thousands of the latter." 475 F. 2d, at 496. Moreover, duties of buyers vary widely depending on the company or industry. It is doubtful whether any generalized standard could be framed which would have more than marginal utility. The Board thus has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific character of the buyers' authority and duties in each company. The Board's judgment that adjudication best serves this purpose is entitled to great weight.

The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements. Nor are fines or damages involved here. In any event, concern about such consequences is largely speculative, for the Board has not yet finally determined whether these buyers are "managerial."

It is true, of course, that rulemaking would provide the Board with a forum for soliciting the informed views of those affected in industry and labor before embarking on a new course. But surely the Board has discretion to decide that the adjudicative procedures in this case may also produce the relevant information necessary to mature and fair consideration of the issues. Those most immediately affected, the buyers and the company in the particular case, are accorded a full opportunity to be heard before the Board makes its determination.

The judgment of the Court of Appeals is therefore affirmed in part and reversed in part, and the cause remanded to that court with directions to remand to the Board for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, dissenting in part.

I concur in Part III of the Court's opinion insofar as it holds that the Board was not required to resort to rulemaking in deciding this case, but I dissent from its hold-

ing in Part II that managerial employees as a class are not "employees" within the meaning of the National Labor Relations Act.

Section 7 of the Act, 29 U. S. C. § 157, provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing . . . ." Section 8 (a)(1), 29 U. S. C. § 158 (a)(1), makes it an unfair labor practice to interfere with the rights guaranteed in § 7, and under § 8 (a)(5), 29 U. S. C. § 158 (a)(5), it is an unfair practice for the employer to refuse to bargain collectively with representatives of his "employees." For the purposes of the foregoing sections, the term "employee" as defined in § 2 (3) of the Act, means "any employee" of the employer,

> "but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act . . . ." 29 U. S. C. § 152 (3).

The issue in this case is whether the term "employee" excludes not only those specifically excluded by § 2 but also the broad category of "managerial" employees who, although literally "employees" of the employer and not expressly excluded by § 2, are nevertheless not to be considered employees for the purposes of the Act because they make and implement managerial policies. The Court holds that no managerial employee is an employee for the purposes of the Act. I cannot agree with this conclusion.

The Act is very plain on its face—"any employee," with specified exclusions, is entitled to the benefits of the Act. Each of the exclusions is a narrow and precisely defined class, and none of them mentions managerial employees. "Supervisors" are excluded, but a precise definition of that class, much narrower than the class of managerial employees, is provided in § 2 (11):

> "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U. S. C. § 152 (11).

Without more, it could not be concluded that Congress meant to exclude a whole category of employees in addition to those expressly excepted in § 2 (3). To infer that all managerial employees are not employees for purposes of the Act because a specified managerial subgroup, supervisors, was expressly excluded, is unwarranted, at least where Congress was careful to define precisely what employees were within the scope of the supervisory exclusion.

What is more, Congress in § 2 (12), 29 U. S. C. § 152 (12), has defined a special subclass of professional employees having special skills and duties "involving the consistent exercise of discretion and judgment in" the performance of their work. These employees are obviously "employees" for the purposes of the Act; and in § 9, 29 U. S. C. § 159, after investing the Board with the powers necessary to decide the units appropriate for collective bargaining, it is provided

that the Board shall not hold any bargaining unit to be appropriate "if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." It is apparent, it seems to me, that there are many professional employees who would qualify as managerial employees; yet the Act clearly treats them as employees for purposes of the Act and Congress assumed they would have full organizational and bargaining rights unless it was provided otherwise in accordance with congressional desires. Hence § 9 (b).

Insofar as the face of the Act is concerned, and as compared with an across-the-board exclusion of "managerial" employees, the present ruling of the Board, which excludes only those managerial employees whose work may involve them in a conflict of interest if they are permitted to bargain collectively, is a far narrower exclusion adhering much more closely to the rationale of the supervisory exclusion and to the apparent intent of Congress. The Court nevertheless not only holds that the term employee *may* be construed to exclude managerial employees but also that it *must* be so construed. No narrower exclusion, it is said, in addition to those expressly provided for, will satisfy the Act.

Although it would appear to be a difficult and questionable feat to rewrite the statute so substantially, the Court purports to find license for its result in the legislative history of the 1947 amendments to the Act, read in the light of previous and subsequent Board and court decisions. It is true that the exclusion of supervisors from the definition of employees first occurred in 1947, but, with all respect, I find no basis in the history of these amendments, read in the light of prior Board cases, for concluding that Congress intended to exclude all

managerial employees, in addition to supervisors, from the benefits of the Act.

As I understand its decisions, the Board at no time prior to 1947 completely excluded the broad category of managerial employees from the class of employees protected by the Act. The Court concedes that the Board's cases during this period involved only the exclusion of managerial employees from bargaining units of rank-and-file workers. Some of the Board's statements may have been ambiguous, but no Board case held or had occasion to hold that managerial employees as a group would not be protected by the Act. As the Court acknowledges, the Board, in one decision excluding buyers and expediters from a unit of office and clerical employees, pointedly expressed the caveat that "[t]his is not to say, however, that buyers and expediters are to be denied the right to self-organization and to collective bargaining under the Act." *Dravo Corp.*, 54 N. L. R. B. 1174, 1177 (1944). In *Hudson Motor Car Co.*, 55 N. L. R. B. 509, 512 (1944), where the Board excluded buyers from a bargaining unit of office and clerical employees, the reason given for the exclusion was "that their duties are closely allied to management, differing materially from those of the other clerical employees." And in *Vulcan Corp.*, 58 N. L. R. B. 733, 736 (1944), the Board excluded a buyer from a production and maintenance employees' unit, not because a managerial employee could not be accorded bargaining rights, but "[b]ecause of the responsibility of his position and his peculiar relationship to management, and in view of the fact that his interests are apparently different from those of the production and maintenance employees." This line of Board decisions addressed the question whether certain managerial employees had sufficient community of interest with rank-and-file employees to be included in the same bargaining unit with them, and the Board was exercising its power to designate

appropriate bargaining units under § 9. It is clear that the Board at no time held managerial employees to be outside the scope of the Act during the period prior to the Taft-Hartley amendments.

The Board's position with respect to supervisors, as a class, vacillated during this time, the Board first excluding supervisors from rank-and-file units but recognizing units confined to supervisory employees, then refusing to recognize any bargaining units of supervisors and finally returning to its earlier rule. But even when the Board determined for a short period that supervisors should not be permitted to organize either with other employees or in separate units, it never went as far as to hold supervisors not to be "employees" under the Act. This was the Court's understanding of the Board's position in *Packard Co. v. NLRB,* 330 U. S. 485, 492 n. 3 (1947), the very case which prompted the 80th Congress to go further than the Board had ever gone and exclude supervisors entirely from the category of employees accorded bargaining rights under the Act.[1] In *Maryland Drydock Co.,* 49 N. L. R. B. 733, 738, 740 (1943), the Board was "no longer convinced that from the mere determina-

---

[1] "The Board had held that supervisory employees may organize in an independent union, *Union Collieries Coal Co.,* 41 N. L. R. B. 961, 44 N. L. R. B. 165; and in an affiliated union, *Godchaux Sugars, Inc.,* 44 N. L. R. B. 874. Then it held that there was no unit appropriate to the organization of supervisory employees. *Maryland Drydock Co.,* 49 N. L. R. B. 733; *Boeing Aircraft Co.,* 51 N. L. R. B. 67; *Murray Corp. of America,* 51 N. L. R. B. 94; *General Motors Corp.,* 51 N. L. R. B. 457. In this case, 61 N. L. R. B. 4, 64 N. L. R. B. 1212; in *L. A. Young Spring & Wire Corp.,* 65 N. L. R. B. 298; *Jones & Laughlin Steel Corp.,* 66 N. L. R. B. 386, 71 N. L. R. B. 1261; and in *California Packing Corp.,* 66 N. L. R. B. 1461, the Board re-embraced its earlier conclusions with the same progressive boldness it had shown in the *Union Collieries* and *Godchaux Sugars* cases. In none of this series of cases did the Board hold that supervisors were not employees. See *Soss Manufacturing Co.,* 56 N. L. R. B. 348."

tion that a supervisor is an employee it follows that supervisors may constitute appropriate bargaining units" because "the benefits which supervisory employees might achieve through being certified as collective-bargaining units would be outweighed not only by the dangers inherent in the commingling of management and employee functions, but also in its possible restrictive effect upon the organizational freedom of rank and file employees." Shortly thereafter, the Board, faced with a claim by the employer that foremen are not employees within the meaning of the Act, did not address this possible ground of decision but held instead that it was "not persuaded that the factors militating against the establishment of units of supervisory employees, set forth in . . . the *Maryland Drydock* case, are obviated by the circumstance that the union seeking to represent such employees is an independent, unaffiliated union." *General Motors Corp.*, 51 N. L. R. B. 457, 460 (1943). Moreover, the Board held in *Soss Mfg. Co.*, 56 N. L. R. B. 348 (1944), that while a bargaining unit of supervisory employees might not be appropriate, a supervisor, like other employees, was nonetheless protected against an unfair labor practice: "We conclude that supervisors are 'employees' and that supervisory status does not by its own force remove an employee from the protection of Section 8 (1) and (3)" of the Act. *Id.*, at 353. Ultimately, in the *Packard* cases, 61 N. L. R. B. 4, 64 N. L. R. B. 1212 (1945), the Board reverted to its earlier rule that bargaining units of supervisors were entitled to recognition under the Act as long as they included no rank-and-file members.

When Congress undertook to amend the Act following this Court's decision in *Packard* upholding the Board's inclusion of supervisors as employees under the Act, it was acting in light of a renewed Board policy to

permit supervisory employees to organize in separate units under the mantle of the Act's protection, an enduring Board policy not. to exclude supervisors from the statutory definition of employees, and a further policy which excluded managerial employees from rank-and-file units but had never denied them the right to establish separate bargaining units or placed them outside the Act's definition of "employee." The amendments adopted by Congress in 1947 in light of this pattern of Board practice clearly intended to do away with the *Packard* decision approving the Board's authority to grant recognition to unions of supervisors. The House and the Senate both proposed to exclude supervisors from the individuals defined as employees for purposes of the Act. The Senate definition of "supervisor" was limited to individuals with authority, in the employer's interest, to take or recommend action involving the employment of other employees, if the exercise of such authority required the use of independent judgment, S. 1126 § 2 (11). But the proposed House definition would also have identified as excluded "supervisors" (a) those who could determine or effectively recommend the wages to be paid other employees, (b) employees with responsibility in the area of labor relations, personnel, employment, police, or time-study matters, and (c) confidential employees, H. R. 3020 § 2 (12). Neither of these proposals sought to exclude in express terms the entire category of "managerial employees," *i. e.,* those who are in a position to formulate, determine, and effectuate management policies beyond the area of labor relations, whether by defining such persons as "supervisors" or by proposing a separate exclusion for "managerial employees." Such a step could easily have been taken had Congress intended to exclude these individuals from the protection of the Act. But it was not, despite the fact that the Board had recently considered whether

certain employees should be denied organizational rights, either because they were supervisory or, separately, because their job responsibilities involved the exercise of managerial discretion. See, *e. g., Ford Motor Co.,* 66 N. L. R. B. 1317, 1322 (1946); *Electric Controller & Mfg. Co.,* 69 N. L. R. B. 1242 (1946). One would expect that if Congress had intended to eliminate the Board's authority to accord bargaining rights to managerial employees, as well as supervisors, it would have said so, particularly as Board practice had treated these two categories separately and differently.

The Court would fill this gap by referring to the House Managers' statement accompanying the Conference Committee Report and explaining the adoption of the narrower Senate definition of excluded "supervisors." This report is indeed instructive, but it indicates even more clearly, in my opinion, that Congress did not contemplate the exclusion of managerial employees from the coverage of the Act:

> "The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential employees as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel,

the special provisions of the Senate amendment . . . applicable with respect to professional employees will cover many in this category. In the case of guards, the conference agreement does not permit the certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards. The provision dealing with the certification of bargaining units for guards is dealt with in section 9 (b) of the conference agreement . . . ."  H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35–36 (1947).

The Court emphasizes that the statutory language adopted in the 1947 amendments did not expressly exclude persons working in labor relations, personnel, or employment departments, or confidential employees, but that these were "impliedly excluded" from the Act's coverage by dint of the House Managers' statements just quoted.  From this premise, the Court proceeds to assume that other categories of employees, similarly not excluded under the express terms of the amended definition of "employee," were also impliedly excluded from the Act.  In my view, there is no warrant for the assumption that groups of employees, which the statute, or express legislative statements, do not address, are to be excluded from the Act; nor is there any legislative debate whatsoever which can reasonably be construed as expressing an authoritative intent to exclude managerial employees as a class.

The House Managers' statement accompanying the Conference Committee Report explains that the Act was not amended expressly to exclude labor relations and confidential employees from coverage under the Act, because it was already prevailing Board practice to exclude these employees.  This was not an entirely accu-

rate representation of Board practice, which seemed to hold only that such employees should not be included in rank-and-file bargaining units, and not necessarily that they would have no protections under the Act, see, e. g., *Murray Ohio Mfg. Co.*, 61 N. L. R. B. 47 (1945); *Ford Motor Co.*, 66 N. L. R. B. 1317 (1946), but even accepting the House Managers' statement as an authoritative direction that these workers were not to be considered employees within the meaning of. § 2, it does not follow that other groups of employees, regarding whom no such explicit direction was set forth and whom the Board had not treated in such a manner, were also intended to be excluded. Such statement implied that certain groups of employees were to be excluded, but it also noted that some timestudy personnel could qualify as professional employees and could therefore organize in units which a majority of them approved, and that guards were not wholly excluded from the Act, but were restricted to units composed solely of other guards. § 9 (b), 29 U. S. C. § 159 (b). Given that Congress made specific provision for timestudy and plant protection employees, who were to be entitled to bargaining rights, and that it expressed a desire to exclude only labor relations and confidential employees whom it thought the Board had previously held outside the Act, there is no reason to suppose from the further congressional silence that special provisions, whether of inclusion or exclusion, were intended with respect to other categories of employees. If it be argued that the absence of any express treatment of managerial employees by Congress was somehow intended to codify prior Board practice, then the unavoidable fact is that Board decisions had not held that managerial employees were unprotected by the Act. They had only been excluded from rank-and-file bargaining units. Moreover, there is no indication in the legislative history as to what

Congress might have perceived the Board's rule to be with respect to managerial employees as a class.[2]

Nor is the Court's position much advanced by the few passing references in the House Report and in the floor debates, which the Court cites, *ante*, at 283, and nn. 12 and 13, for the assumption that "executives" would be excluded from the Act apart from whether they were confidential employees or not, and for the discussion of supervisors as representatives of management whom the amendments sought to exclude. In none of the cited passages was the category of "managerial employees," as the Board had defined it, ever addressed, and the focus of these remarks is clearly directed at the exclusion of supervisors as defined in the proposed amendments. Perhaps it was clear to Congress that a confidential secretary's superior would be excluded by the Act, but such an individual would either be a confidential employee himself, or a supervisor, or both. We are referred to

---

[2] The majority argues that "no explicit exclusionary provision was necessary in 1947 because the Board had never approved the organization of 'managerial employees' in either a separate unit or as part of a rank-and-file unit." *Ante*, at 284–285, n. 13. It does not dispute, however, that the Board had never disapproved their organization either, and admits that the Board had stated in *Dravo Corp.*, 54 N. L. R. B. 1174 (1944), that by excluding buyers from a clerical employees unit it did not mean to say they would be denied bargaining rights under the Act. The Board had not held managerial employees excluded prior to 1947, and Congress did not address itself to the class of "managerial employees" by that term or by reference to the Board's definition. There is, therefore, no justification for excluding from the statutory designation of "any employee" an entire class that the Board had not previously excluded and that Congress did not expressly deal with in its amendments to the Act or in the legislative materials surrounding their adoption. If Congress had intended to exclude managerial employees, it would have said *something* about them, since it took such great pains to discuss supervisors and labor relations, confidential, time-study, and plant protection employees.

nothing in the debates or other congressional materials where the category of managerial employees, as distinguished from the class of supervisory employees, a distinction the Board had previously drawn, is discussed.[3]

Finally, if we are to consider the 1947 amendments as intending to enact the views of the dissenting Justices in *Packard,* it should be noted that the dissent interpreted the National Labor Relations Act to "put in the employer category all those who acted for management not only in formulating but also in executing *its labor policies."* 330 U. S., at 496. (Emphasis supplied.) See also *id.,* at 500. Limiting the exclusion of managerial employees to those who are charged with the formulation or implementation of labor relations policies, as the Board has now done in the case before us, is

---

[3] The majority expresses concern that extending organizational and bargaining rights to managerial employees would permit the extension of the Act to vice presidents and other high level executives, thereby blurring the distinction between management and labor. The concern is overblown; for most, if not all, executives will obviously be "super" supervisors, confidential employees, professionals or within the Board's definition of those employees whose organization would result in a conflict of interest with respect to the company's labor policies. If there are remaining executives outside these categories who should also be excluded, the Board should be told to exclude that particular group, rather than to exclude the managerial class that would reach not only vertically, but laterally, to deny "hundreds of thousands," 475 F. 2d 485, 496, of buyers and other relatively low-level management employees the organizational benefits and other protections of the Act otherwise available to "any employee."

To argue, as the majority does, that had Congress intended to include managerial employees, it would have said so expressly, ignores the fact that the Act covers "any employee" and that the burden properly falls on those who would exclude managerial employees to demonstrate that it was the intent of Congress to exclude this category when it legislated directly to exclude supervisory employees.

entirely consistent with this view and with the purposes of the Act. As the Senate Report noted, its concern in changing the law with respect to supervisory employees, as construed by *Packard*, was that the balance of power in the collective-bargaining process had been upset by "the successful efforts of labor organizations to invoke the Wagner Act for covering supervisory personnel, traditionally regarded as part of management, into organizations composed of or subservient to the unions of the very men they were hired to supervise." S. Rep. No. 105, 80th Cong., 1st Sess., 3 (1947). See also H. R. Rep. No. 245, 80th Cong., 1st Sess., 13 (1947); 93 Cong. Rec. 3553. Where an employee may be deemed managerial because of the nature of his duties apart from supervision of other employees, however, there is no reason to suppose that union affiliation, at least in separate units, would raise the same labor relations concern.

Following the Taft-Hartley amendments in 1947, the Board continued to hold, as it had frequently held before, that buyers, and others with managerial interests, were to be excluded from bargaining units of other employees. *Denver Dry Goods,* 74 N. L. R. B. 1167 (1947); *Palace Laundry Dry Cleaning,* 75 N. L. R. B. 320 (1947); *Denton's, Inc.,* 83 N. L. R. B. 35, 37 (1949); *Wise, Smith & Co.,* 83 N. L. R. B. 1019, 1021 n. 6 (1949); *Westinghouse Electric Corp.,* 89 N. L. R. B. 8, 14 (1950). But in 1950, in *American Locomotive Co.,* 92 N. L. R. B. 115, 117, the Board, in rejecting the inclusion of buyers in an office and clerical employees unit or their placement in a separate bargaining unit, said that "[a]s it appears that the buyers are authorized to make substantial purchases for the Employer, we find that they are representatives of management, and as such may not be accorded bargaining rights under the Act." Reliance for this

statement was placed on the *Wise, Smith & Co.* case and *Westinghouse Electric* case which involved the appropriateness of placing the managerial employees in a particular bargaining unit. In *Swift & Co.,* 115 N. L. R. B. 752 (1956), the Board held that a proposed unit of procurement drivers could not be accorded bargaining rights, even in a separate unit. There, the Board flatly asserted that it was "the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management." *Id.,* at 753–754. The sole support for this statement, which the Board has now repudiated, was a reference to the statutory definitions of "employee" and "employer" and to the Conference Committee Report's explanation of the term "supervisors," as quoted above and reprinted in the Congressional Record.

The Board thereafter continued to exclude managerial employees from bargaining units of other employees, occasionally citing *Swift, e. g., Copeland Refrigeration Corp.,* 118 N. L. R. B. 1364, 1365 n. 2 (1957); *AFL–CIO,* 120 N. L. R. B. 969 (1958), but more frequently excluding managerial employees from particular units without citing that case or suggesting that the excluded workers were not protected employees. *E. g., Mack Trucks, Inc.,* 116 N. L. R. B. 1576, 1577–1578 (1956); *Diana Shop,* 118 N. L. R. B. 743, 745 (1957); *Federal Tel. & Radio Co.,* 120 N. L. R. B. 1652, 1654 (1958); *Kearney & Trecker Corp.,* 121 N. L. R. B. 817, 822 (1958); *Weaver Motors,* 123 N. L. R. B. 209, 216 (1959); *Eastern Camera & Photo Corp.,* 140 N. L. R. B. 569, 572 (1963).

Until the Board overruled *Swift* in *North Arkansas Electric Cooperative, Inc.,* 185 N. L. R. B. 550 (1970), it had thus actually held only twice that managerial employees could not be afforded protection under the Act, and its support for that conclusion was without any persuasive appeal. It is true, of course, that the Board had not held to the contrary either, and that

various courts of appeals interpreted and deferred to the Board's position as one of total exclusion of managerial employees from the scope of the Act, although in none of these cases was that conclusion necessary to the result reached. But the Board has now rejected this broad exclusion, and the question is whether the current view should be sustained. That the Board now refuses to follow its prior precedents is no reason to overturn it, for we have frequently sustained Board decisions overruling its prior interpretations of the Act. *E. g., Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168 (1973); *Packard Co.* v. *NLRB,* 330 U. S. 485 (1947). And the face of the Act and the events of 1947 demonstrate that the Board's present decision is a permissible construction of the statute.

Nor did Congress in 1959, when it again amended the statute, expressly or impliedly enact or approve the statutory interpretation announced in *Swift & Co.* The 1959 amendments dealt with secondary boycotts and picketing, and we are cited to nothing suggesting that the attention of Congress at that time was directed to or focused on the question whether managerial employees were covered or excluded in the statute. Congressional silence does not imply legislative approval of all Board rulings theretofore made. As the Court noted in *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235, 241–242 (1970), which overruled *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195 (1962):

> "Nor can we agree that the conclusive weight should be accorded to the failure of Congress to respond to *Sinclair* on the theory that congressional silence should be interpreted as acceptance of the decision. The Court has cautioned that '[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.' *Girouard* v.

*United States,* 328 U. S. 61, 69 (1946). Therefore, in the absence of any persuasive circumstances evidencing a clear design that congressional inaction be taken as acceptance of *Sinclair,* the mere silence of Congress is not a sufficient reason for refusing to consider the decision."

See also *Commissioner* v. *Glenshaw Glass Co.,* 348 U. S. 426, 431 (1955). Similarly, from the congressional silence in 1959 concerning *Swift's* exclusion of managerial employees from the protection of the Act, it should not be assumed that Congress intended to approve of *Swift* and foreclose the possibility of the Board's reconsidering *Swift* and overruling it on further and more examining reflection. *NLRB* v. *Seven-Up Co.,* 344 U. S. 344, 350–352 (1953).

The Board's decisions in this area have not established a cohesive and precise pattern of rulings. It is often difficult to tell whether an individual decision is based on the propriety of excluding certain employees from a particular bargaining unit or whether the worker under consideration is thought to be outside the scope of the Act. But this Court has consistently said that it will accept the Board's determination of whether a particular individual is an "employee" under the Act if that determination "has 'warrant in the record' and a reasonable basis in law," *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 131 (1944); *NLRB* v. *United Insurance Co.,* 390 U. S. 254, 260 (1968). There is no reason here to hamstring the Board and deny a broad category of employees those protections of the Act which neither the statutory language nor its legislative history requires simply because the Board at one time interpreted the Act—erroneously it seems to me—to exclude all managerial as well as supervisory employees.

I respectfully dissent.