620 F.2d 720
 104 L.R.R.M. (BNA) 2524, 88 Lab.Cas. P 12,051
 STEPHENS INSTITUTE, a corporation d/b/a Academy of Art
College, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
California Federation of Art Teachers, Local No. One, Intervenor.
 Nos. 79-7132, 79-7215.
 United States Court of Appeals,
Ninth Circuit.
 May 5, 1980.
Rehearing Denied June 25, 1980.
 
 Benjamin H. Parkinson, Jr., Ackerman, Johnston, Norberg & Parkinson, San Francisco, Cal., David J. Salniker, Berkeley, Cal., for petitioner.
 
 
 1
 Andrew Tranovich, Washington, D. C., argued for respondent; Elliott Moore, Ruth E. Peters, N. L. R. B., Washington, D. C., on brief.
 
 
 2
 On Petition for Review and Cross-Applications for Enforcement of an Order of the National Labor Relations Board.
 
 
 3
 Before KILKENNY and SCHROEDER, Circuit Judges, and CAMPBELL, Senior District Judge.*
 
 CAMPBELL, Senior District Judge:
 
 4
 In two separate petitions, the Board found that the Stephens Institute (the Academy) had engaged in unfair labor practices in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 151, et seq. The Board seeks enforcement of its orders issued pursuant to those findings. The Academy challenges the Board's exercise of jurisdiction in both proceedings, and appeals the substantive finding of unfair labor practices in the second proceeding (Case No. 79-7215). We conclude that the Board properly exercised jurisdiction in both proceedings, and grant enforcement of both orders.
 
 
 5
 The history of this case is one of a long and bitter dispute between the Academy and its instructors. The Academy is a corporation. The principal stockholder and President is Richard A. Stephens. Stephens is also the principal administrative officer, and is responsible for the ultimate decision making. Stephens' principal assistants are Donald Haight, Vice President and Registrar, Jan Schroeder and Michael Ryan. The school employs approximately 58 instructors teaching in various art departments. Most departments have a department chairman, although the responsibilities of department chairmen have never been very clearly defined. Instructors are paid on the basis of the number of classes per week they teach, and only department chairmen receive an annual salary.
 
 
 6
 In the fall of 1976 approximately 1,100 students were enrolled in the school, about 400 to 450 of which were full time. In mid-November of 1976, a group of students drafted a petition seeking better wages and benefits for faculty members. Upon learning of this petition, Stephens invited Joseph Doyle, co-chairman of the Fine Arts Department, into his office to discuss the demands. Subsequently, a meeting was held which Stephens, Doyle, Paul Pratchenko, the other co-chairman of the Fine Arts Department, Schroeder and several other persons attended. Subsequent meetings were also held in December, during which the demands for better salary were discussed. During these meetings, Stephens threatened Doyle and Pratchenko with dismissal and on one occasion stated that they "will never teach again" at the Academy. On December 22, 1976, Stephens informed Doyle that he was being offered only one class for the following semester. The reason given was that Doyle's three advanced classes had not filled. At that meeting Doyle blamed the problem of unfilled advanced classes on the registration procedures, and accused Stephens of trying to punish him for union activity. At the time, Doyle was being paid $700 per month for teaching four classes. Shortly thereafter, Doyle called to accept the offer to teach one class, at which time he was informed that the offer had been withdrawn, because he was "hostile towards the Administration."
 
 
 7
 While these meetings with Stephens were ongoing, Doyle and Pratchenko also met with faculty members to discuss the possibility of organizing a union. In early January of 1977, thirteen faculty members organized the California Federation of Art Teachers, Local No. 1 (the Union). Shortly thereafter, the Union contacted Stephens requesting a meeting. A meeting was held on January 13, 1977 in Stephens' office. Those present included Ernest Posey, business representative for the Union, Joe Rees, a sculpture teacher, and also a member of the Union Negotiating Committee, Elizabeth Sher, also a member of that committee, and David Sokol, the Union's attorney. The Academy was represented by Stephens, Haight, Ryan and two attorneys. At that meeting the Union representatives stated that they were preparing a proposed contract to submit to Stephens for consideration. The proposed contract was submitted on January 17, 1977.
 
 
 8
 Upon receiving the proposed contract, Stephens began contacting the individual faculty members who had participated in the formation of the Union and offered each of them a separate contract. When faculty members such as Rees indicated a reluctance to sign the contract while negotiations with the Union were ongoing, Stephens responded that he would "just as soon put a lock on the door than accept the Union contract." When instructors declined to sign Stephens' contract, they were handed their letter of resignation to sign. Several Union members signed the Academy's contract, and those that did not sign were dismissed.
 
 
 9
 As a response to Stephens' actions during January of 1977, the Union members voted unanimously to go on strike. On January 20, 1977, the strike began, and a picket line was formed at the Academy. At about that time Posey went to see Stephens with a letter listing the Union's proposed changes to Stephens' contract, at which point Stephens told Posey that he would fight the Union all the way and close half the school if necessary. Stephens also threatened Posey with physical violence during that meeting.
 
 
 10
 While the strike was in progress, Stephens approached several of the strikers and offered to pay them higher salaries if they would leave the Union and return to work. No member of the Union accepted Stephens' offer. In Late January of 1977 Stephens fired all of the striking instructors. On February 16, 1977, the strikers submitted an unconditional offer to return to work, which was refused.
 
 
 11
 Apparently in an effort to avoid further labor unrest, Stephens and several of the non-union members organized a "Faculty Senate" in February of 1977. The Administration and the "Faculty Senate" met and established a commitment providing for faculty wages and benefits, faculty review, faculty leave, hiring and termination of members, grievance procedures, class size and other working conditions.
 
 
 12
 After members' repeated offers to return to work were declined, the Union filed a complaint with the Board's Regional Office. The complaint charged the Academy with violation of the National Labor Relations Act, Section 8(a)(1), Interference with Union Activity, Section 8(a)(3), Discriminatory Discharge, and 8(a)(5), Refusal to Bargain. The Refusal to Bargain charge was subsequently deleted. The Academy answered the charges by denying any wrongdoing and contending that it lacked the requisite annual gross revenues to become subject to the Board's jurisdiction.
 
 
 13
 At a hearing commenced before Administrative Law Judge Stevens in August of 1977, counsel for the Board's General Counsel announced that certain issues would be eliminated from the proceeding pursuant to a settlement agreement. The General Counsel added the caveat that the deletion of charges was subject to fulfillment of the terms of the settlement, and without prejudice to reinstate those charges in the event Stephens failed to reinstate the strikers. The settlement was approved, and the hearing then proceeded on the remaining issues, which involved reinstatement and back pay as to six instructors which the Academy considered supervisors.
 
 
 14
 The settlement agreement provided that sixteen of the strikers would be reinstated with back pay; that the remaining six strikers, whose status was still at issue, would be temporarily reinstated subject to the A.L.J.'s ultimate ruling; that the Union would withdraw its request for a bargaining order; that a recognition election would be held in the Fall of 1977; and that the parties would enter into stipulations of facts as to service of the charges; the Union's status as a labor organization; the status of certain Academy officials as agents; and the Board's jurisdiction over the Academy.
 
 
 15
 The stipulation of facts was contained in a separate document from the settlement. While the settlement agreement was approved by the Board's Regional Director, the Board was not a party to the stipulation.
 
 
 16
 When the settlement agreement was reached in August 1977, the striking instructors were offered an opportunity to return to teach classes in the fall semester. On September 2, 1977, the Friday before all classes were to commence, Registrar Haight checked registration figures for classes which had not filled up to minimum size. While several of the courses with below minimum enrollment were retained, 34 of the classes were cancelled. This resulted in 10 strikers and 1 non-striker losing all of their classes for failure to meet minimum enrollment standards. Evidence was later introduced to show that the Academy filled certain classes taught by non-union instructors by taking students from overly-enrolled classes and placing them in the under-enrolled sections. Evidence was introduced to show that under-enrolled classes taught by Union instructors were not given the full benefit of the late registration period in order to meet minimum enrollment requirements. Also, there was evidence which tended to show that non-union instructors whose classes did not fill were retained and reassigned, while the Union instructors were simply terminated.
 
 
 17
 As a result of these events, the Union filed new unfair labor practice charges, and the Regional Director withdrew approval of the settlement. Thereupon, the General Counsel for the Board moved to reopen the record, to amend the complaint, and to consolidate the new charges of unfair labor practices. On November 11, 1977 Administrative Law Judge Stevens granted the motions.
 
 
 18
 On January 10 and 11, 1978 hearings were held on the reinstated and new charges. At no point during that hearing did either party seek to withdraw any of the stipulations of fact, or the settlement agreement. To the contrary, the Academy's defense to the charges was based on the class size minimum set out in the settlement agreement.
 
 
 19
 On March 23, 1978, Administrative Law Judge Stevens entered an extensive Order making specific findings as to credibility of witnesses and findings of fact and conclusions of law. He found that the Academy derived gross revenues in excess of one million dollars and purchased goods, materials and supplies valued in excess of five thousand dollars directly from suppliers located outside the State of California. The A.L.J. received no evidence in support of these findings. His conclusion was based solely on the prior stipulation between counsel as to jurisdiction. The A.L.J. found that the Academy had engaged in numerous unfair labor practices by interrogating instructors with regard to Union activity, threatening instructors, refusing to provide contracts to instructors who engaged in Union activity, attempting to interfere with participation in the strike, and finally by terminating the instructors who participated in the strike. In addition to finding that the Academy's actions in early 1978 leading up to the initial termination of Union instructors constituted unfair labor practices, A.L.J. Stevens also found that the subsequent cancellation of classes in September of 1978 and termination of Union instructors who had been rehired constituted unfair labor practices. These findings of the Administrative Law Judge were, in substantial part, adopted by the Board.
 
 
 20
 The Academy does not appeal the Board's substantive finding of unfair labor practices. The Academy's attack on that determination is solely jurisdictional. Appellant contends that the dissolution of the settlement agreement vitiates the stipulation to jurisdiction. Absent that stipulation, the Academy contends, there is a failure of proof of jurisdiction in that proceeding.
 
 
 21
 The second Order of the Board presently on appeal arises out of the termination of photography instructor, William Cutchins, in the fall of 1977, and of Joe Rees and Paul Pratchenko in January 1978 for under-enrolled spring term classes.
 
 
 22
 Rees and Pratchenko had been reinstated, along with the other strikers, during the fall of 1977. While their classes survived the cancellations of the Fall 1977 term, they were not as fortunate at the beginning of the following term.
 
 
 23
 William Cutchins participated in the initial strike, and was terminated as a result of that participation. He was subsequently reinstated in August of 1978 pursuant to the settlement agreement between the Academy and the Union. In addition to one teaching assignment, Cutchins was supposed to serve as technician in the photo laboratory. Cutchins' was never assigned to the laboratory technician position by the Director of the Photography Department.
 
 
 24
 In October 1977, Cutchins was attending a Student Senate Hearing. At the meeting Cutchins suggested that the students might want to concern themselves with the fact that 20% of the fall classes had been cancelled, almost all of which were taught by former strikers. Also, a student asked Cutchins about the school's accreditation. Cutchins responded that he was not sure about the school's accreditation, but that he thought the school was accredited through the University of San Francisco. He also stated that as far as he knew, he was the only member of the Photography Department with teaching credentials. Upon learning of Cutchins' comments, a Faculty Review Committee was convened to evaluate Cutchins' teaching performance. The committee consisted of Instructor Yates, the head of the Photography Department, Michael Woods, Director of the Fine Arts Department both non-union instructors and Cutchins' selection, Michael Dumont, another instructor in the Photography Department. When Cutchins met with the evaluation committee, he was informed that his "attitude" was in question. Cutchins later testified that Yates referred to him as "a dinosaur" and a "relic from another time," and further, that Yates told Cutchins that his "union friends aren't here anymore and we are the Faculty Senate and we are running things." Cutchins was subsequently dismissed for making critical remarks about the Academy to its students.
 
 
 25
 A.L.J. Myatt held a hearing on charges arising out of these dismissals on August 15, 1978. At that hearing the Union introduced evidence of the Academy's gross receipts for 1977, as well as testimony recounting the events which led to Cutchins' dismissal.
 
 
 26
 A.L.J. Myatt entered specific findings of fact and conclusions of law on December 28, 1978. He recited the circumstances surrounding the prior admission as to jurisdiction, and concluded that the Respondent could not attempt to rescind the validity of that admission in the subsequent proceeding. He found that the Respondent could not contend that the jurisdictional standards were not met absent a showing of changed circumstances since the prior proceeding. He went on to find, however, that irrespective of the prior admission, the jurisdictional standards had been met. The A.L.J. specifically relied on the testimony of the Academy's Certified Public Accountant who stated that net tuition income for the year 1977 had been $998,000 and that Appellant had also received $13,000 in rental income and $24,000 in interest income during the year. After finding that the Board's jurisdictional standards had been met, the A.L.J. went on to find that Instructors Cutchins, Rees and Pratchenko had all been terminated as a result of their Union activity, in violation of the Act. That finding was adopted by the Board. The Academy appeals from the Board's finding that these discharges were motivated by union activity, and contends that the A.L.J. committed reversible error by relying on the prior stipulations to jurisdiction in the latter case.
 
 
 27
 The Academy's argument that the stipulation to jurisdiction was vitiated is a mixture of general equity and principles of contract law. The Academy contends that the settlement agreement and the stipulation of facts, while separate documents, are part of one transaction. If one part of the transaction the settlement is set aside, the entire transaction including the stipulations must also be set aside. In support of that proposition the Academy relies on cases which hold that it is inequitable for a party to withdraw his burdens under a contract or stipulation without forfeiting the benefits derived under that agreement. See e. g. Stoffela v. Nugent, 217 U.S. 499, 30 S.Ct. 600, 54 L.Ed. 856 (1910), and A & A Sign Company v. Maughan, 419 F.2d 1152 (9th Cir. 1969).
 
 
 28
 This argument is defective in several respects. The most obvious problem with this argument is that the Academy is hardly in a position to invoke equity considerations. It was the Academy's conduct which jeopardized the viability of the settlement. Having failed to honor the fundamental terms of the agreement, appellant will not be heard to complain of the alleged injustices which flow from its own breach. Yet, there is a more fundamental problem with the Academy's position. The reopening of charges before the Administrative Law Judge did not, and could not, affect those facts which were already in evidence in the case. Whether those facts were adduced by stipulation, testimony or documentary evidence, they are part of the record in the case. The reopening of the proceeding, in accordance with the terms of the settlement agreement, does not nullify the stipulation to jurisdiction. In addition, the Academy's defense at the hearing did not call into question the existing stipulation. At no point did the Academy seek to withdraw from the stipulation. Rather, appellant simply argued that it had cancelled the classes pursuant to the minimum enrollment provisions of the settlement agreement.[1] We cannot accept the Academy's assertion that either equity or general principles of contract law require this Court to set aside a stipulation which was freely entered into, never withdrawn, and is part of the record in the case.
 
 
 29
 Appellant's position with respect to jurisdiction in the second proceeding is equally unpersuasive. While Administrative Law Judge Myatt considered the stipulation in the prior proceeding, he also based his finding of jurisdiction on evidence of gross receipts for the year in question. The testimony of the Academy's accountant relating to gross receipts provides ample evidence to support the A.L.J.'s finding of jurisdiction.
 
 
 30
 The Academy's appeal of the findings of unfair labor practices is limited to the discharge of William Cutchins in the Fall of 1977, and of Rees and Pratchenko in January 1978. The Academy contends Cutchins was terminated for disparaging his employer, rather than for his union association. With respect to Rees and Pratchenko, the Academy contends that their discharge was based solely on minimum registration levels. Administrative Law Judge Myatt concluded that Cutchins was terminated because he made remarks to a student group regarding the ongoing labor dispute. The A.L.J. concluded that this was in violation of Sections 8(a)(1) and 8(a)(3) of the Act. He reached the same conclusion regarding Rees and Pratchenko, based on his finding that these discharges were a result of their continued union activity. The Board adopted these findings and conclusions.
 
 
 31
 Our task is solely to determine whether these findings are supported by substantial evidence from the record as a whole. N.L.R.B. v. Universal Camera Corp., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). While this Court might reach a different conclusion based on the same evidence, we may not overturn the Board's determination if it is supported by substantial evidence. N.L.R.B. v. Ayer Lar Sanitarium, 436 F.2d 45, 48 (9th Cir. 1970).
 
 
 32
 In Western Exterminator v. NLRB, 565 F.2d 1114 (9th Cir. 1977), this Court held that a discriminatory motive must be the dominant or moving cause of a discharge. As the Court has recognized, this can be a more demanding standard of proof than the previously adhered to "but for" test. Polynesian Cultural Center, Inc. v. NLRB, 582 F.2d 467, 473 (9th Cir. 1978). While A.L.J. Myatt did not employ adjectives such as "dominant" or "moving", he specifically concluded that Cutchins, Rees and Pratchenko were discharged because of their Union activity. Our review of the facts leading up to the dismissal of these instructors leads us to the conclusion that a discriminatory purpose was the moving cause of their termination. Moreover, there is substantial evidence in the record to support that conclusion, irrespective of our agreement with the A.L.J. The Board's findings of violations of Sections 8(a)(1) and (3) will not be set aside.
 
 
 33
 Finally, the parties have submitted numerous letters and memoranda on the applicability in this case of the Supreme Court's recent decision in NLRB v. Yeshiva University, --- U.S. ----, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). In that case the Court held that the faculty of a "mature" private university are more than simply professional employees. Because of their significant role in formulating and implementing university policy, they are "managerial employees" and thus excluded from the coverage of the Act. 100 S.Ct. pp. 861-862. See also NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).
 
 
 34
 The Academy contends that the instructors in question are managerial employees within the meaning of Yeshiva and are therefore excluded from the protection of the Act. The Board argues that because the "managerial employee" exception was not raised before the Board, the Academy is barred from raising that objection under Section 10(e) of the Act, 29 U.S.C. § 160(e). Section 10(e) provides that unless "failure or neglect to urge such objection (before the Board) shall be excused because of extraordinary circumstances," the objection shall not be heard by the Court of Appeals. See e. g. NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961).
 
 
 35
 Generally, we would be inclined to view a controlling pronouncement from the Supreme Court as an extraordinary circumstance and would excuse the failure to raise the issue below.[2] However, Yeshiva is not such a case. In Yeshiva the Court applied the managerial employee exception to a "mature" university. The Court relied heavily on the policy making role of the faculty at such an institution. The instructors at the Academy hardly share such a role. They have no input into policy decisions, and do not engage in management level decision making. They are simply employees. Also, the Academy bears little resemblance to the nonprofit "mature" university discussed in Yeshiva. In summary, we find that Yeshiva is inapplicable to this case, and therefore not the "extraordinary development" which might otherwise excuse appellant's failure to raise the managerial employee exception before the Board.
 
 
 36
 The Board has adopted the Orders of Administrative Law Judges Stevens and Myatt calling for reinstatement with back pay, and that the Academy cease engaging in unfair labor practices. For the reasons set forth herein, ENFORCEMENT is GRANTED.
 
 
 
 *
 Honorable William J. Campbell, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Appellant raised this jurisdictional objection before the Board. Thus, the Academy is not precluded from raising it again in this Court. See NLRA § 10(e), 29 U.S.C. § 160(e)
 
 
 [2]
 Furthermore, judicial economy dictates that we explore the effect of Yeshiva on this case