644 F.2d 286
 106 L.R.R.M. (BNA) 3045, 90 Lab.Cas. P 12,659
 UNITED STATES STEEL CORPORATION, Inland Steel Company,
Bethlehem Steel Corporation, Employers, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
District 2 Marine Engineers Beneficial Association
Associated MaritimeOfficers, AFL-CIO, District 2 Marine
Engineers Beneficial AssociationAssociated Maritime
Officers, AFL-CIO, Safety and Education Plan,
UnitedSteelworkers of America, Intervenors.
 No. 80-1477.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 7, 1980.
Decided March 19, 1981.
 
 S. G. Clark, Jr. (argued), AlmaLee P. Postell, Pittsburgh, Pa., for U. S. Steel Co.
 Hideo S. Onoda, Chicago, Ill., for Inland Steel Co.
 John L. Kluttz, Bethlehem, Pa., for Bethlehem Steel Co.
 Joel C. Glanstein (argued), O'Donnell & Schwartz, New York City, Gerald B. Lackey, Joan Torzewski, Green, Lackey & Nusbaum, Toledo, Ohio, for intervenor District 2 Marine Engineers Beneficial Ass'n Associated Maritime Officers, AFL-CIO.
 Roger H. Briton (argued), Martin C. Seham, Seham, Klein & Zelman, New York City, for intervenor District 2 Marine Engineers Beneficial Ass'n Associated Maritime Officers, AFL-CIO, Safety and Education Plan.
 J. Keith Gorham (argued), W. Christian Schumann, William A. Lubbers, John E. Higgins, Jr., Robert E. Allen, Elliott Moore, Washington, D. C., for N.L.R.B.
 Thurlow Smoot, Cleveland, Ohio, for intervenor United Steelworkers of America.
 Before HUNTER and GARTH, Circuit Judges, and SAROKIN,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Petitioners United States Steel Corporation, Inland Steel Company, and Bethlehem Steel Corporation ("the steel companies") ask us to set aside an order and decision of the National Labor Relations Board ("the Board") requiring petitioners to bargain collectively with intervenor United Steel Workers of America ("the Union") with respect to wages and working conditions at a summer licensing school established by petitioners, intervenor District 2 Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO ("MEBA"), and intervenor District 2 Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO, Safety and Education Plan ("the Plan") to prepare unlicensed seamen for Coast Guard licensing examinations. The Board has filed a cross-application for enforcement of its order.[1] Because we find that the Board's order is not supported by substantial evidence, the petition for review to set aside the decision and order of the Board will be granted, and the Board's cross-application for enforcement will be denied.
 
 I.
 
 2
 The steel companies operate fleets of vessels that carry iron ore from the northern Great Lakes ports to the steelmaking centers in the south. Crews on these vessels are classified as either licensed or unlicensed personnel. Licensed personnel include captains, mates, engineers, and stewards; unlicensed personnel include watchmen, deck hands, oilers, firemen, firemen-maintenance and wipers. Unlicensed personnel on petitioners' iron-ore vessels are represented by Local 5000 of the Union. Licensed personnel are either unrepresented or represented by MEBA or the Masters, Mates & Pilots.
 
 
 3
 To supply petitioners and other employers with sufficient numbers of licensed personnel, MEBA and the Plan have annually operated winter schools in Toledo, Ohio to prepare employees to take Coast Guard licensing examination. Because of a shortage of licensed personnel, MEBA and the Plan had previously conducted summer licensing schools in 1973 and 1974.[2]
 
 
 4
 By 1978, there was once again a shortage of licensed personnel to operate the Great Lakes vessels. On June 22, 1978, the Joint Training Advisory Committee[3] ordered the establishment of a special summer school to commence on July 31, 1978 for a period of ten to thirteen weeks. Petitioners selected ten unlicensed employees (five from United States Steel, two from Inland, and three from Bethlehem) to attend the school.
 
 
 5
 There was no provision in the collective bargaining agreement between the Union and the steel companies regarding a special licensing school. Petitioners chose seamen for the school on the basis of recommendations from supervisors. Employees who attended the school were paid sixty percent of their regular wages; the steel companies retained forty percent, its payment contingent upon an employee's return for at least thirty days. Petitioners provided travel and subsistence expenses for employees enrolling in the school. Payment was made twice monthly, rather than once per month as when the employees were sailing. The time spent at the school accrued towards vacation and year end bonuses provided for in the collective bargaining agreement. Petitioners suspended their normal practice of either checking off, or issuing separate checks for, union dues of unlicensed personnel attending the summer school. After successful completion of the course and licensing examination, employees were not obligated to return to their former employers.
 
 
 6
 On July 19, 1978, the Union filed unfair labor practice charges against the steel companies for refusing to bargain over wages, hours and other conditions of employment for employees attending the summer school. A hearing was held before an administrative law judge ("ALJ") who, in a decision and order issued on September 28, 1979, dismissed the Union's complaint because: 1) employees attending the summer school had no community of interest with unlicensed personnel on petitioners' ships; 2) the summer school students fell outside of the certified bargaining unit; 3) the employees at the summer school were supervisory or managerial trainees, and hence outside of the bargaining unit; and 4) the terms and conditions of employment at the summer school did not vitally affect bargaining unit employees.
 
 
 7
 In a decision and order of March 31, 1980,[4] the Board reversed the decision of the ALJ. The Board found
 
 
 8
 (T)he students here involved did not cease to be employees of Respondents (below) during their summer training but remained members of the units of unlicensed personnel employed by these Respondents. Accordingly, we find that the terms and conditions under which they attended the summer training school were mandatory subjects of bargaining and that Respondents' unilateral actions with respect to such terms and working conditions constituted violations of Section 8(a)(5) and (1) of the Act.
 
 
 9
 248 N.L.R.B. No. 90 at 6, reprinted in Appendix for Petitioners at 465a.
 
 
 10
 The Board ordered the steel companies to bargain collectively with respect to wages and working conditions of the summer school.
 
 II.
 
 11
 We must accept the Board's findings of violations of sections 8(a)(1) and 8(a) (5) of the National Labor Relations Act ("the Act") 29 U.S.C. §§ 158(a)(1) & (5) (1976), if they are supported by substantial evidence on the record as a whole, even if we would have resolved the issue differently in first instance. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We have examined the record in the case, but are unable to find substantial evidence to support the Board's finding that the students of the special summer school remained members of the units of unlicensed personnel employed by petitioners. Because we agree with the ALJ that there is no community of interest between the students attending the summer school and the shipbound employees, we decline to enforce the decision and order of the Board.
 
 
 12
 In our view, the students attending the licensing school were supervisory trainees[5] who lacked a community of interest with the unlicensed personnel remaining on petitioners' vessels. Our community of interest analysis is derived from a long line of decisions of the Board concerning the bargaining unit status of supervisory and management trainees. In WTOP, Inc., 115 N.L.R.B. 758 (1956), the Board delineated the factors to be considered in evaluating the interest of supervisory trainees:
 
 
 13
 (P)lanned supervisory training program for a definite period of time, selectiveness exercised by the Employer in the acceptance of applicants for this program and the fact that trainees do not continue with the Employer after completion of the training program unless retained as a supervisor.
 
 
 14
 115 N.L.R.B. at 759.
 
 
 15
 In Cherokee Textile Mills, Inc., 117 N.L.R.B. 350 (1957), supervisory trainees were found to be excluded from the bargaining unit because of their background and "expectation of supervisory status." In Diana Shop of Spokane, Inc. and Hughes Apparel, Inc., 118 N.L.R.B. 743 (1957), management trainees were excluded from a unit because of their supervisory training and the temporary nature of their employment. The Board in Montgomery Ward & Co., Incorporated, 131 N.L.R.B. 1436 (1961), held that management trainees have interests more closely allied with management than with rank-and-file employees. It also found management trainees to be excluded from a bargaining unit of banking employees in Banco Credito y Aharro Ponceno, 160 N.L.R.B. 1504 (1966), because they engaged in a formal training program of definite duration. Finally, in Curtis Industries, Division of Curtis Noll Corporation, 218 N.L.R.B. 1447 (1975), management trainees were once again found to be excluded from the protection of the National Labor Relations Act.[6]
 
 
 16
 The community of interest analysis developed in these cases was synthesized by the administrative law judge in Curtis Noll who concluded:
 
 
 17
 From the above cases it appears that the factors which must be applied in the instant case are fourfold. First, selectivity in hiring based on the management trainee's possession of relevant education or experience; second, a specificity of future employment prospects, that is to say, the management trainees must be shown to have no alternatives other than to go into management ultimately or to leave the employ of the employer. If it appears that they would not be kept on as employees if they failed to qualify in the managerial jobs to which they are assigned, the factor is met. Third, there must be a planned management trainee program. It may be noted that the duration of such program does not appear to be much of a factor; the decisions range from several weeks to several years. Finally, the cases reveal that a considerable factor is a showing of a distinction of wages and working conditions between the management trainees and the employees beside whom they worked.
 
 
 18
 218 N.L.R.B. at 1452.
 
 
 19
 Applying these four factors to the instant case, it becomes apparent that the students at the summer licensing school lacked a community of interest with the unlicensed seamen who would later be under their command. With respect to the first factor, selectivity, petitioners unilaterally selected employees for the licensing school on the basis of experience, past record and recommendations by supervisors.[7] Moving to the third factor, a planned training program, it is undisputed that the summer school was a formal ten-to-thirteen week course developed solely to prepare unlicensed seamen for the Coast Guard examinations. As to the fourth factor the distinction between trainees' and other employees' wages and working conditions students were physically separated from the unlicensed seamen and performed no bargaining unit work whatsoever. Students were paid only sixty percent of their normal wages and were paid on a different shore-based payroll.[8] Union dues were not checked off or collected from students as from unlicensed personnel. Moreover, and most significantly, students attended the school for the purpose of becoming licensed officers, that is, non-bargaining unit employees.
 
 
 20
 Despite this disparity between the interests of the students attending the summer school and the unlicensed seamen, the Board concluded that the absence of an "up-or-out" requirement, the second factor in the Curtis Noll analysis, allied the students' interests with those of bargaining unit employees. The Board distinguished the result in Curtis Noll and WTOP from the instant case on the ground that managerial and supervisory trainees in those cases had "no alternative other than to advance into management positions or to leave the employ of the employer,"[9] whereas unsuccessful applicants for licensed positions were free to return to their previous unlicensed positions.
 
 
 21
 We reject the Board's attempt to make one factor of the Curtis Noll analysis determinative of bargaining unit status. The ALJ's opinion[10] in that case clearly stated that all four factors discussed above were to be analyzed in evaluating the interests of managerial and supervisory trainees. The Board's novel interpretation of Curtis Noll[11] is not a substitute for a reasoned community of interest analysis.
 
 
 22
 Therefore, we believe that the Board's finding that there was a sufficient community of interest between the unlicensed seamen and the students at the summer licensing school to retain the latter within the bargaining unit is not supported by substantial evidence on the record as a whole, and that there was no violation of sections 8(a)(1) and 8(a)(5) of the Act.
 
 
 23
 Accordingly, we decline to enforce the Board's order and we grant the petition to review and set aside the decision and order.[12]
 
 
 24
 GARTH, Circuit Judge, concurring, with whom SAROKIN, District Judge, joins.
 
 
 25
 I am in complete agreement with the majority's conclusion that the students attending the licensing school were supervisory trainees lacking a community of interest with the unlicensed personnel remaining on the vessels. Thus, I join in the result reached by the majority. I write separately, however, to emphasize that in my opinion the central inquiry in this matter is whether the students attending the summer school remained members of the bargaining unit. My reading of the record satisfies me that the Board improperly included them in the bargaining unit.
 
 
 26
 The record discloses that the expectations of both the steel companies and those employees selected to attend the school were such that the students involved would graduate to licensed positions. Assuming these expectations were fulfilled, the students would no longer be represented by United Steel Workers. As the majority points out, those students who attended the school were paid sixty percent of their regular wages, with the remaining forty percent contingent upon their return to their former employers, in either a licensed or unlicensed capacity, for at least thirty days. Thus, although the students had no obligation to return to their former employers, and their former employers, in turn, did not have preferential hiring rights, the employers, in establishing this payment schedule, were clearly offering the forty percent payment as an incentive to both successful and unsuccessful students to return to their former companies.
 
 
 27
 Viewed in this light, the evidence is compelling that the steel companies at no time intended to maintain the students' status as bargaining unit employees. Given the companies' objective of encouraging qualified employees to participate in the licensing program, the adoption of incentives as well as provisions to insure that unsuccessful students would not be in a worse position than they were before entering the program, is perfectly understandable.
 
 
 28
 An examination of the language used by the Regional Director in certifying the Steel Workers as the exclusive bargaining representative of the employees of the steel companies and the language found in the relevant collective bargaining agreements, reveals unequivocally that the students were outside the bargaining unit. Both the terms of the Board certification and the terms of the parties' agreements emphasize the physical presence of the employees on the vessel. Neither contemplates the inclusion in the bargaining unit of individuals who are not on board or employed on the vessels operated by their employers:
 
 
 29
 NLRB Certification Contractual Definition
 Language of Bargaining Unit
 ------------------------- -------------------------
USS "All unlicensed seaman
 on board the employer's "All unlicensed personnel
 vessels . . ." (App. . . . employed
 8; 13) on the fleet of Great
 Lakes vessels." (App.
 9; 13)
Bethlehem "All unlicensed personnel
 on board the vessels, "All unlicensed
 presently operated by personnel . . . employed
 the employer . . ." on all of the bulk
 (App.9; 13) freight vessels operated
 by . . ."(App.
 10; 13)
Inland "All unlicensed personnel
 on board all vessels
 owned and/or operated "All unlicensed
 by employer Inland personnel . . . employed
 . . ." (App. 8-9; on all bulk freight
 13) vessels . . ."(App.
 10; 13)
 
 
 30
 Thus, the students who spent no time on board were clearly never intended to be members of the bargaining unit.
 
 
 31
 Moreover, the evidence in this record discloses that any student who successfully completed the program not only would become a member of a new and perhaps competing union, but also would assume supervision over Local 5000, United Steel Worker members. The Supreme Court, writing in a similar context, noted that severe internal conflicts might ensue if competing interests were represented in the same unit:
 
 
 32
 Here, even if, as the Board found, active and retired employees have a common concern in assuring that the latter's benefits remain adequate, they plainly do not share a community of interests broad enough to justify inclusion of the retirees in the bargaining unit. Pensioners' interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment. Incorporation of such a limited-purpose constituency in the bargaining unit would create the potential for severe internal conflicts that would impair the unit's ability to function and would disrupt the processes of collective bargaining. Moreover, the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits.
 
 
 33
 (footnote omitted). Chemical Workers Local 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 172, 92 S.Ct. 383, 394, 30 L.Ed.2d 341 (1971). The potential for conflict which could "impair the unit's ability to function and ... disrupt the processes of collective bargaining" is obvious under the instant circumstances. Taking into account these tensions, together with the lack of community interest discussed in the majority opinion, I conclude that the students were improperly included in the bargaining unit.
 
 
 34
 I therefore concur in the majority's decision to grant the companies' petition for review and set aside the Board's decision and order.
 
 
 
 *
 Honorable H. Lee Sarokin, of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Jurisdiction lies to enforce or review the Board's order under sections 10(e) and 10(f) of the National Labor Relations Act, 29 U.S.C. §§ 160(e) & (f) (1976)
 
 
 [2]
 Petitioners' obligation to bargain over wages and other terms and conditions of employment in the 1973 and 1974 summer schools is not at issue in the instant case
 
 
 [3]
 The 1968 collective bargaining agreements between the steel companies and MEBA provided for the establishment of a Joint Training Advisory Committee charged with the responsibility for the study and development of training for licensed personnel. The Committee consists of representatives from MEBA and various industry employers (including petitioners), but not the United Steelworkers of America
 
 
 [4]
 United States Steel Corporation, 248 N.L.R.B. No. 90 (March 31, 1980), reprinted in Appendix for Petitioners at 460a-472a
 
 
 [5]
 The students attended the school to obtain an original engineer's license or an original first class pilot's license which would enable them to become third assistant engineers or third mates. A number of courts have held that these officers are supervisors for the purposes of the Act. Newport Tankers Corp. v. NLRB, 575 F.2d 477 (4th Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978); International Org. of Masters, Mates and Pilots v. NLRB, 539 F.2d 554 (5th Cir. 1976), cert. denied, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977); International Org. of Masters, Mates and Pilots v. NLRB, 486 F.2d 1271 (D.C.Cir.1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974)
 
 
 [6]
 The Supreme Court has made it clear that all managerial employees are excluded from the protection of the Act. NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1973)
 
 
 [7]
 General Counsel's Exhibit No. 11, an internal United States Steel memorandum to masters and chief engineers concerning the establishment of the summer school, noted that "(s)election will be based on the individual's past record, the current recommendations, and the number of students we will be able to send." Chief engineers were requested to submit a list of unlicensed crew members expressing an interest in the school, and also to submit "the names of any individuals not expressing an interest in the program, but who the Chief feels would be a qualified engineer."
 
 
 [8]
 Attendance at the school was included in the calculations of vacations and year-end bonuses and insurance benefits were retained
 
 
 [9]
 United States Steel Corporation, 248 N.L.R.B. No. 90 at 4 n.4, reprinted in Appendix for Petitioners at 463a
 
 
 [10]
 The Board's decision in Curtis Noll affirmed the rulings, findings, and conclusions of the ALJ, and adopted his recommended order. 218 N.L.R.B. at 1447
 
 
 [11]
 The Board read Curtis Noll as devising a new test to evaluate the status of managerial trainees dependent solely upon the "up-or-out" requirement. As we have indicated, we believe that Curtis Noll is consistent with, not a departure from, the community of interest analysis developed by the Board in a long line of cases. We concur in the fifth circuit's opinion that "(t)he factors for establishing when participation in a 'managerial trainee program' will amount to managerial status did not originate in Curtis Noll, but as the decision itself shows, derive from a series of cases decided by the Board many years earlier." NLRB v. Kent Corp., 564 F.2d 186, 188 (5th Cir. 1977) (footnote omitted)
 
 
 [12]
 Judge Sarokin joins in this opinion in all respects and also joins in the concurring opinion of Judge Garth