**NATIONAL WHISTLEBLOWER CENTER, Petitioner,**

v.

**NUCLEAR REGULATORY COMMISSION and United States of America, Respondents.**

**Baltimore Gas and Electric Company, Intervenor.**

Nos. 99–1002, 99–1043.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 2000.

Decided April 11, 2000.

Rehearing and Rehearing En Banc Denied June 15, 2000.

this matter.

Peter B. Bloch argued the cause for petitioner. With him on the briefs were Stephen M. Kohn, Michael D. Kohn and David K. Colapinto.

John F. Cordes, Jr., Solicitor, United States Nuclear Regulatory Commission, argued the cause for respondents. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, United States Department of Justice, Mark Haag, Attorney, Karen D. Cyr, General Counsel, United States Nuclear Regulatory Commission, E. Leo Slaggie, Deputy Solicitor, and Marjorie S. Nordlinger, Senior Attorney.

David R. Lewis, argued the cause for intervenor Baltimore Gas and Electric Company. With him on the briefs was James B. Hamlin.

Before: EDWARDS, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

The petition for review in this case presents a claim by the National Whistleblower Center ("Center") seeking to overturn a decision by the Nuclear Regulatory Commission ("NRC" or "Commission") denying intervention by the Center in a nuclear power plant license renewal proceeding. The relicensing at issue involves the Calvert Cliffs nuclear facilities operated by Baltimore Gas & Electric ("BG&E"). This is the second time that this matter has come before this court. On November 12, 1999, the court issued a judgment holding that the NRC erred in rejecting the Center's petition to intervene in the Calvert Cliffs license renewal proceeding. *See National Whistleblower Center v. NRC*, No. 99–1002, Slip. Op., 1999 WL 1024662 (D.C.Cir. Nov. 12, 1999). Following a *sua sponte* inquiry by the court, however, this judgment was vacated, *see National Whistleblower Center v. NRC*, 196 F.3d 1271 (D.C.Cir.1999), and the case was reargued before the court on March 2, 2000. Upon reconsideration, we deny the Center's petition for review.

Any third party seeking to participate in a relicensing proceeding must file a motion to intervene, followed by a timely submission of "contentions." A contention is a specific issue of law or fact that the third party seeks to have adjudicated; it must be substantiated by an explanation of its bases, a statement of supporting facts or expert opinion, appropriate references and citations, and sufficient information to indicate that a genuine dispute exists between the party seeking to intervene and the applicant. The Center's problems in this case arose when it failed to make a timely filing of contentions in support of its petition to intervene in the Calvert Cliffs relicensing proceeding.

The Center complains that the NRC erred in applying an overly rigid standard in assessing their requests for extensions of time. According to the Center, the Commission was required to adhere to a well-established "good cause" test in considering petitions for extensions of time. The NRC replies, in turn, that it gave clear notice in a published policy statement and in a subsequent referral order in the Calvert Cliffs proceeding that the agency intended to adopt a streamlined schedule in license renewal proceedings. The referral order specifically directed that "the Licensing Board should not grant requests for extensions of time absent unavoidable and extreme circumstances." *In re Baltimore Gas & Elec. Co.*, Order Referring Petition for Intervention and Request for Hearing to Atomic Safety and Licensing Board Panel, CLI–98–14,6 (Aug. 19, 1998), *reprinted in* Joint Appendix ("J.A.") 23, 28.

We hold, first, that the NRC was free to adopt, without resort to notice-and-comment rulemaking, the "unavoidable and extreme circumstances" standard for application in the Calvert Cliffs proceeding, so long as affected parties had proper notice of the standard and it was not arbitrary and capricious, or otherwise in violation of the law. There is no doubt here that the agency's policy statement and subsequent referral order at the start of the Calvert Cliffs proceeding gave the Center and other interested parties adequate notice. Furthermore, the agency's adoption of the "unavoidable and extreme circumstances" standard did not reflect any arbitrary and capricious, or otherwise unlawful action. The revised standard was not an extreme departure from the "good cause" standard and it was adequately explained by the Commission; and the agency was not bound by any law to adhere to the old "good cause" standard.

Furthermore, on the record at hand, the Center can show no cognizable injury. The disputed "unavoidable and extreme

circumstances" test was undoubtedly applied once, when the Licensing Board denied the Center's request for an extension of time to file contentions. However, that action was reversed by the NRC when it *granted* the Center's petition for more time. The Center thereafter failed to meet the extended deadline. The Center claims that it filed a subsequent motion for an extension upon missing the extended deadline, but the record belies this claim. And, even assuming, *arguendo,* that the October 1, 1998 filings to which the Center refers can be viewed as a request for an additional extension of time, it is clear that those filings do not indicate even good cause for the purported request. In other words, the Center was not denied any extension of time that might otherwise have been obtained if the Commission had applied the "good cause" standard. Thus, the Center suffered no prejudice from the agency's application of the disputed "unavoidable and extreme circumstances" test.

The record in this case indicates that the contested motion to intervene was properly denied by the Commission, because the Center failed to submit the required contentions within the prescribed deadline. Accordingly, the petition for review is hereby denied.

## I. BACKGROUND

The Calvert Cliffs relicensing process officially commenced on April 8, 1998, when BG&E applied to renew its licenses to operate the nuclear power plant. A few weeks later, the application was made public and the Commission announced that interested third parties would have an opportunity to request a hearing. *See* Notice of Receipt of Application, 63 Fed.Reg. 20,-663 (1998). On May 19, 1998, the Commission accepted BG&E's application for docketing, again noted that the application was publicly available, and again announced that third parties would be afforded an opportunity to request a hearing. *See* Notice of Acceptance for Docketing of the Application, 63 Fed.Reg. 27,601 (1998).

On July 8, 1998, the NRC published a notice outlining the rights of third parties to seek a hearing in the Calvert Cliffs proceeding. *See* Notice of Opportunity for a Hearing, 63 Fed.Reg. 36,966 (1998). The July 8 Notice indicated that anyone seeking a hearing would be required to file a request and an application to intervene by August 7, 1998. The Notice also indicated that such parties would be required to file "a supplement to the petition to intervene which must include a list of contentions which are sought to be litigated in the matter." *Id.* at 36,966.

The Calvert Cliffs case is the first of many nuclear power plant license renewal proceedings. In view of the anticipated large number of license renewal applications, and also in response to "recent experience and criticism of agency proceedings," the Commission announced its intention to streamline procedures for adjudicatory actions before the agency. Policy on Conduct of Adjudicatory Proceedings, 63 Fed.Reg. 41,872, 41,873 (1998). The NRC recognized that "the opportunity for hearing should be a meaningful one"; the Commission, however, noted that "applicants for a license are also entitled to a prompt resolution of disputes concerning their applications." *Id.* Accordingly, in this policy statement, the Commission "identified certain specific approaches for its boards to consider implementing in individual proceedings, if appropriate, to reduce the time for completing licensing and other proceedings." *Id.* In particular, the Commission stated that requests for extensions of time should only be granted "when warranted by unavoidable and extreme circumstances." *Id.* at 41,874.

A few days after issuance of the policy statement, the Center filed a petition to intervene in the Calvert Cliffs proceeding. The Commission referred the motion to intervene to an Atomic Safety and Licensing Board ("Board") for further action. *See In re Baltimore Gas & Elec. Co.,* Order Referring Petition for Intervention

and Request for Hearing to Atomic Safety and Licensing Board Panel, CLI–98–14 (Aug. 19, 1998), *reprinted in* J.A. 23. The NRC's Referral order contained a number of directives to the Board, including limitations on the scope of the proceeding and a suggested schedule for completing the proceeding. Drawing from its policy statement, the Commission instructed the Board not to grant "requests for extensions of time absent unavoidable and extreme circumstances." *Id.* at 6, *reprinted in* J.A. 28.

On August 20, 1998, the Licensing Board issued an Initial Prehearing Order. *See In re Baltimore Gas & Elec. Co.*, ASLBP No. 98–749–01–LR, Memorandum and Order, Initial Prehearing Order (Aug. 20, 1998), *reprinted in* J.A. 42. The order contained deadlines for submissions as well as other procedural directives. Specifically, the order directed the Center to file its required contentions by September 11, 1998, and noted that a prehearing conference would be held during the week of October 13. The order also stated that any requests for extensions of time were to be submitted three business days before the due date for the pleading and emphasized that such requests must "demonstrate 'unavoidable and extreme circumstances.'" *Id.* at 10, *reprinted in* J.A. 51.

The day after the Board issued its Prehearing Order, the Center filed two motions, one directed to the Commission requesting that it vacate the referral order, and another directed to the Board requesting that it extend the time for contentions and delay the prehearing conference until at least December 1, 1998. In the Motion to Vacate, the Center objected to the NRC's directive that extensions of time be granted only in "unavoidable and extreme circumstances." The Center argued that "[i]t is illegal and improper for the [Commission] not to follow the 'good cause' standard" set forth in 10 C.F.R. § 2.711(a). Petition's [sic] Motion to Vacate Order CLI–98–14, 7 (Aug. 21, 1998). In denying the motion to vacate, the NRC stated that

the agency had "plenary supervisory authority over its adjudications and adjudicatory boards," which "allows it to interpret and customize its process for individual cases." *In re Baltimore Gas & Elec. Co.*, Memorandum and Order, CLI 98–15, 6–7 (Aug. 26, 1998), *reprinted in* J.A. 55, 60–61. The Commission also noted that the unavoidable and extreme circumstances standard "simply gives content ... to [the] rule's general 'good cause' standard." *Id.* at 6–7 n. 5, *reprinted in* J.A. 60–61 n.5. For these and other reasons, the Commission denied the Center's Motion to Vacate.

The Board, in turn, denied the Center's Motion for Enlargement of Time. The Board held that the Center had failed to demonstrate the requisite "unavoidable and extreme circumstances" required to justify an extension of time. *See In re Baltimore Gas & Elec. Co.*, ASLBP No. 98–749–01–LR, Memorandum and Order, Denying Time Extension Motion and Scheduling Prehearing Conference, 3 (Aug. 27, 1998), *reprinted in* J.A. 65, 67. Accordingly, the Center's deadline for submitting contentions remained September 11, 1998. The Center, however, filed no contentions on September 11. Instead, it filed a Petition for Review with the Commission appealing the Board's denial of its request for an extension. The Center argued that the Board was wrong to deny it an extension of time, and that the deadline for contentions was itself improper. Under the current schedule, the Center argued, it "should have had ... until September 30, 1998 to make the required filings." Petition for Review, 6–7 (Sept. 11, 1998).

The Commission acquiesced. While it stood by the Board's application of the "unavoidable and extreme circumstances" test, the Commission nonetheless granted the Center until September 30, 1998, to file its contentions. *See In re Baltimore Gas & Elec. Co.*, Memorandum and Order, CLI–98–19 (Sept. 17, 1998), *reprinted in* J.A. 71. The next day, the Center filed a motion asking the Board to delay the pre-

hearing conference, or, in the alternative, provide for a one-day extension to accommodate a Jewish holiday. *See* Petitioner's Motion to Vacate Pre–Hearing Conference or in Alternative for an Extension of Time (Sept. 18, 1998). The Board denied the request to delay the prehearing conference, but granted the one-day extension, making the Center's contentions due October 1, 1998. *See In re Baltimore Gas & Elec. Co.,* ASLBP No. 98–749–01–LR, Memorandum and Order, Scheduling Matters and Electronic Hearing Database (Sept. 21, 1998), *reprinted in* J.A. 74.

The Center missed the extended October 1, 1998 deadline. No contentions were filed on that date. Rather, the Center filed a "Status Report," a "Motion to Vacate and Re–Schedule the Pre–Hearing Conference," and a "Motion Requesting to be Informed of Communication Between the NRC Staff and Applicant." The Center also filed an answer to questions raised about its standing. The Status Report listed the experts hired by the Center and the areas of concern that they would cover. In the Motion to Vacate, the Center noted that the Commission's staff had submitted "Requests for Additional Information" ("RAIs") to BG&E and that BG&E was not required to submit its responses to the RAIs until November 21, 1998. The Center argued that it would be prejudicial and unfair to the Center to require it to submit its contentions before BG&E had submitted its responses to the RAIs. Thus, the Center argued, "the pre-hearing conference should be postponed until no sooner than 115 days after [BG&E] submits its response to the RAI." Petitioner's Motion to Vacate and Re–Schedule the Pre–Hearing Conference, 6 (Oct. 1, 1998). The Motion Requesting to be Informed of Communication Between the NRC Staff and Applicant asked that the Center be included on the agency's service list for written communications and given notification of status conferences regarding the BG&E application.

It was not until October 13, 1998, when the Center finally filed two purported contentions. Subsequently, on October 16, 1998, the Board dismissed the Center's petition to intervene. The Board held that the Center had "failed to establish cause" for an extension, failed to file any contentions before the prescribed deadline, and failed to show that the contentions filed on October 13 met the late-filed contention standards. *In re Baltimore Gas & Elec. Co.,* ASLBP No. 98–749–01–LR, Memorandum and Order, Denying Intervention Petition/Hearing Request and Dismissing Proceeding, 19–20 (Oct. 16, 1998), *reprinted in* J.A. 315, 333–34. The Center then sought review by the NRC.

The Commission upheld the Board's dismissal, rejecting the Center's argument that it was denied extensions of time to which it was entitled under the "good cause" standard. Although the NRC defended the "unavoidable and extreme circumstances" test, it found no need to apply it. Rather, the Commission held that the Center's "complete failure to provide specific information about its concerns precluded any finding that 'good cause,' in a meaningful sense, justified [the Center's] requested extensions of time prior to [October 1st]." *In re Baltimore Gas & Elec. Co.,* Memorandum and Order, CLI–98–25, 10–11 (Dec. 23, 1998), *reprinted in* J.A. 336, 345–46. The Commission also upheld the Board's decision to reject contentions filed by the Center on October 13, both because the Center failed to meet the late-filed contention standards, and also because the purported contentions were wholly inadequate. This appeal followed.

## II.  ANALYSIS

The Center has voiced many objections in protesting the NRC's actions in this case. Almost all of the objections are plainly meritless. One objection, however, warrants our attention. That one objection rests on the Center's claim that the NRC erred in adopting and applying an "unavoidable and extreme circumstances"

test, in lieu of a "good cause" test, to assess requests for extensions of time in which to file contentions in the Calvert Cliffs nuclear power plant license renewal proceeding. We reject this claim, because the Commission was fully justified in adopting the disputed test and, also, because the Center suffered no prejudice in the Commission's application of the new standard.

### A. NRC's Authority to Change an Adjudicatory Rule

■ The Center contends that the Commission erred in applying the "unavoidable and extreme circumstances" test to its requests for extensions of time. The correct standard, argues the Center, is the "good cause" test articulated in the Commission's regulations. The Commission argues that the "unavoidable and extreme circumstances" test simply gives content to "good cause." Moreover, the NRC adds, the adoption of the new standard resulted in no breach of law, because the "Commission implemented it with a case-specific adjudicatory order." Supp. Br. for Respondents at 9. The Commission has the better of this argument. We are in complete accord with the Seventh Circuit's position that the NRC possesses the authority "to change its procedures on a case-by-case basis with timely notice to the parties involved." *City of West Chicago v. NRC*, 701 F.2d 632, 647 (7th Cir.1983) (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)). There is no claim here that the Center lacked timely notice of the new "unavoidable and extreme circumstances" standard. The Commission announced its intention to adopt the standard in a policy statement published on August 5, 1998. Although the policy statement, alone, was not binding, it nonetheless informed the Center and other interested parties of the impending change. *See Panhandle Eastern Pipe Line Co. v. FERC*, 198 F.3d 266, 269 (D.C.Cir.1999) ("Th[e] advance-notice function of policy statements yields significant informational benefits, because policy

statements give the public a chance to contemplate an agency's views before those views are applied to particular factual circumstances."). More importantly, the Center received express notice that the new standard would be applied in the Calvert Cliffs proceeding when the Commission adopted the standard in its referral order to the Licensing Board. Indeed, the Center responded to this notice when it objected to the referral order, and to the "unavoidable and extreme circumstances" test specifically, in its August 21, 1998 Motion to Vacate. *See* Petition's [sic] Motion to Vacate Order CLI–98–14, 7 (Aug. 21, 1998).

In short, the Center's argument that the Commission lacked authority to change an adjudicatory rule is simply wrong.

### B. The "Unavoidable and Extreme Circumstances" Standard is a "Procedural" Rule that Was Properly Adopted Without Notice-and-Comment Rulemaking

■ We also hold that the disputed "unavoidable and extreme circumstances" standard embodies a procedural rule. Rules that "prescribe[ ] a timetable for asserting substantive rights" are procedural. *Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295, 328 (D.C.Cir.1983). And unless such rules "foreclose effective opportunity to make one's case on the merits," they need not be promulgated pursuant to notice-and-comment rulemaking. *Id.*

■ The disputed agency action in this case merely altered a standard for the enforcement of filing deadlines; it did not purport to regulate or limit the Center's substantive rights. In other words, the new rule was procedural, not substantive. *See JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 327–28 (D.C.Cir.1994) (holding that a rule governing the content and timing of case filings is "procedural," even when it arguably "encodes the substantive value judgment that applications containing minor errors should be sacrificed to

promote efficient application processing"). As the court noted in *JEM,* "agency housekeeping rules often embody a judgment about what mechanics and processes are most efficient." *Id.* at 328. This does not convert a procedural rule into a substantive one.

The NRC has expressed a clear and reasonable goal of expediting nuclear power plant license renewal proceedings, both to accommodate the large number of cases to be heard and to ensure fair processes for applicants and would-be intervenors alike. The adoption of the "unavoidable and extreme circumstances" standard did not foreclose participation by third parties seeking to intervene in the Calvert Cliffs proceeding; rather, to facilitate expedited case processing, the new rule merely required parties who failed to meet otherwise reasonable deadlines to demonstrate compelling reasons before they could obtain any extensions of time beyond prescribed deadlines.

The Center argues that, under *Lamoille Valley,* the NRC could not adopt the "unavoidable and extreme circumstances" standard except through notice-and-comment rulemaking, because the new rule, in conjunction with the other rules on intervention, "create[d] a regime which renders it impossible for the public to set forth substantive contentions." Petitioner's Supp. Br. at 10–11 (citing *Lamoille Valley,* 711 F.2d at 328). This is a specious claim. The Commission's determination to expedite license renewal proceedings resulted in tight schedules. However, would-be intervenors were not denied an effective opportunity to be heard. BG&E's application was publicly available for five months prior to the time when the Center was required to submit contentions. Even using the Center's preferred starting date, *i.e.,* July 8, 1998 (when the NRC published a notice outlining the rights of third parties to seek a hearing in the Calvert Cliffs proceeding), the Center still had 85 days to prepare its contentions. This was a sufficient amount of time, especially considering that the default period for submitting contentions is only 75 days. *See* Rules of Practice, 43 Fed.Reg. 17,798, 17,799 (1978) (establishing that a pre-hearing conference is normally set 90 days after the initial hearing notice and noting that contentions are normally to be submitted 15 days prior to the prehearing conference, thus allowing 75 days between the initial hearing notice and the default deadline for contentions).

Thus, given that the prescribed deadline for filing contentions did not itself foreclose effective opportunity to be heard, *a fortiori,* the Commission's decision to tighten the standard for granting extensions of time did not, as the Center claims, "create a regime which render[ed] it impossible for the public to set forth substantive contentions."

## C. NRC's Adoption of a New Procedural Standard Easily Survives "Arbitrary and Capricious" Review

■ The only remaining question at issue is whether the NRC's adoption of the new procedural standard in the Calvert Cliffs proceeding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). It was not. A change to procedures in an adjudicatory order is not arbitrary or capricious when it merely refines an existing procedural standard and when no affected party has detrimentally relied on the old standard. *See, e.g., Bell Aerospace,* 416 U.S. at 294–95, 94 S.Ct. 1757; *Ruangswang v. INS,* 591 F.2d 39, 44–45 (9th Cir.1978).

NRC's adoption of a new procedural standard did not significantly or unreasonably change the regime pursuant to which requests for extensions of time are judged, because the "unavoidable and extreme circumstances" standard is not off the moorings of "good cause." *See City of Orrville v. FERC,* 147 F.3d 979, 988 n. 11 (D.C.Cir. 1998) (noting that the Commission was within its discretion to use adjudication to refine its regulation's "good cause" stan-

dard to require a showing of "extraordinary circumstances"); *In re Bjella*, 806 F.2d 211, 216 (10th Cir.1986) (en banc) ("There is no significant distinction between a showing of good cause and a showing of unusual or extreme circumstances.").

Moreover, the Center has shown no detrimental reliance in this case. The Center was bound to follow prescribed deadlines for the submission of required contentions. They had no basis upon which to assume that those deadlines automatically would be waived upon request pursuant to the old good cause standard. Indeed, the Center has offered nothing to indicate that, in preparing their contentions, they acted to their detriment on the assumption that their requests for extension of time would be favorably considered pursuant to the old good cause test. Quite frankly, such an argument would be silly.

■ In short, the Commission did not abuse its discretion in adopting the "unavoidable and extreme circumstances" test in the Calvert Cliffs adjudicatory proceeding. The Center makes a weak argument that the Commission's new procedural rule was arbitrary and capricious, because the agency offered no adequate explanation for the changed policy. *See* Petitioner's Supp. Reply Br. at 3. We disagree. As previously noted, the Commission's policy statement that immediately preceded the adoption of the adjudicatory order in the Calvert Cliffs proceeding fully explained the need for expedited case processing. 63 Fed.Reg. at 41,873–74. Given the wide latitude an agency has in designing its own proceedings, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. ·519, 524–25, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the NRC's decision to expedite case processing in license renewal proceedings to accommodate an impending heavy docket was well within the realm of the agency's discretion. The policy statement, which was expressly cited in the Commission's referral order to the Licensing Board, adequately sup-

ported the Commission's adoption of the "unavoidable and extreme circumstances" test. The agency action easily survives arbitrary and capricious review.

## D.  The Center Has Shown No Prejudicial Error

■ In the end analysis, this case appears to be much ado about nothing. The Center has complained strenuously about the NRC's adoption of a new standard under which the agency will assess requests for extensions of time in which a petitioner must file contentions. But the Center has offered absolutely nothing to show how the promulgation of the new rule, even if, *arguendo*, in error, resulted in prejudice or other cognizable harm to them. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *see also Fried v. Hinson*, 78 F.3d 688, 690–91 (D.C.Cir.1996) (dismissing petitioner's claim for lack of a showing that he had been prejudiced by the agency's adoption of modified procedures). We can find no prejudicial error in this case.

The Center's first request for an extension of time was filed with the Licensing Board on August 21, 1998. *See* Petitioner's Motion for Enlargement of Time (Aug. 21, 1998). The Board denied the request, applying the "unavoidable and extreme circumstances" test. The Center petitioned the Commission for review, claiming that, under the current schedule, it was entitled until September 30, 1998 "to make the required filings." See Petition for Review, 6–7 (Sept. 11, 1998). The Commission overturned the Board's decision, granted the petition for review, and allowed the Center an extension of time until September 30, 1998 in which to file contentions. Subsequently, the Center requested "a one day extension of the September 30, 1998 filing date" to accommodate a Jewish holiday observed by Petitioner's attorneys. Petitioner's Motion to Vacate Pre–Hearing Conference or in Alternative for an Extension of Time, 2 (Sept. 18, 1999). This request was also granted. *See In re Balti-*

*more Gas & Elec. Co.*, ASLBP No. 98–749–01–LR, Memorandum and Order, Scheduling Matters and Electronic Hearing Database (Sept. 21, 1998), *reprinted in* J.A. 74. The Center missed the extended deadline, failing once again to file contentions within the prescribed time limit.

On October 1, rather than file the required contentions, the Center filed four different documents, none of which was labeled as a request for an extension. The Center argues that its October 1 "Motion to Vacate and Re–Schedule the Pre–Hearing Conference" should be construed as a request for an extension. Even if the so-called Motion to Vacate could be viewed as a request for a further extension of time in which to submit contentions, the Center's position would still fail. The principal problem here is that the motion was not a supported request for an extended deadline. Rather, it presented an argument that the Center should not be required to submit contentions before BG&E had submitted responses to staff RAIs. At oral argument, counsel for the Center candidly conceded that, as propounded in the Motion to Vacate, "the RAI's were our peg." *See* Tr. of Oral Argument March 3, 2000 at 49. This "peg," however, provided absolutely no support for a request for a further extension of time. It is clear that, under prevailing law, the Center had no right to the RAIs. *See Union of Concerned Scientists v. NRC*, 920 F.2d 50, 55–56 (D.C.Cir.1990). In fact, at oral argument, counsel conceded that the Center "did not have a right to discovery of the RAIs." *See* Tr. of Oral Argument March 3, 2000 at 49. This being the case, it can hardly be claimed that the Center could condition the filing of contentions on receipt of RAIs and answers thereto.

■ At oral argument, counsel for the Center cited the Commission's Rules of Practice for Domestic Licensing Proceedings—Procedural Changes in the Hearing Process, 54 Fed.Reg. 33,168 (Aug. 11, 1989), in an effort to bolster the claim that the Center had a right to view RAI material before submitting contentions. Under the cited provision, "an intervention petitioner has an ironclad obligation to examine the publicly available documentary material pertaining to the [nuclear power] facility in question with sufficient care to enable the petitioner to uncover any information that could serve as the foundation for a specific contention." *Id.* at 33,170. In other words, a potential intervenor must review the NRC Public Document Room for any materials that might be relevant to formulating contentions. *See* Tr. of Oral Argument March 3, 2000 at 49–50. According to the Center, in order to satisfy this rule, a potential intervenor must have access to the RAIs (which are kept in the Public Document Room) before it can be required to file contentions. The Public Document Room argument comes much too late. The argument was never presented to the Commission and it was not raised in any of the many briefs that have been submitted to the court in this case. The claim is, in a word, untimely. *See United Transp. Union v. Surface Transp. Bd.*, 114 F.3d 1242, 1244 (D.C.Cir. 1997); *Cronin v. FAA*, 73 F.3d 1126, 1134 (D.C.Cir.1996).

Even if we were to view the Public Document Room argument as one that naturally flows from the Center's other claims on RAIs, and thus properly within the compass of the petition for review before this court, we would nevertheless reject the argument as patently specious. The cited regulation merely says that an intervention petitioner is obliged "to examine the *publicly available* documentary material." Obviously, if a document has not been filed in the Public Document Room, or if it is filed too late to be considered by an intervention petitioner, then the petitioner cannot be held responsible for reviewing it. Nothing in the rule suggests otherwise. Therefore, we must surmise that the Center's belated Public Document Room argument is nothing more than an attempt to avoid the clear policy that denies would-be intervenors any enti-

tlement to RAIs as a condition precedent to filing contentions.

There can be no doubt that, on the record before us, the Center suffered no prejudicial error when the Commission adopted the new "unavoidable and extreme circumstances" standard in the Calvert Cliffs proceeding. The Center sought and received from the NRC two extensions of time in which to file contentions. When they failed to meet the extended deadlines, their motion to intervene was properly denied.

### III. CONCLUSION

For the reasons given above, the petition for review is denied.